Josefina Najarro DE SANCHEZ

v.

**BANCO CENTRAL DE NICARAGUA**
and Citizens and Southern
International Bank.

Civ. A. No. 79–4281.

United States District Court,
E. D. Louisiana.

April 20, 1981.

John G. DeRussy, New Orleans, La., for plaintiff.

William R. Pitts, Joe B. Norman, Liskow & Lewis, New Orleans, La., for defendant Banco Central de Nicaragua.

Warren M. Schultz, Jr., Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for defendant Citizens and Southern International Bank.

## MEMORANDUM AND ORDER

SEAR, District Judge.

This case involves application of the Foreign Sovereign Immunities Act of 1976

("FSIA" or "Immunities Act"), 28 U.S.C. §§ 1330, 1391, 1441, 1602–1611, against the backdrop of the Nicaraguan revolution which ousted the regime of Anastasio Somoza Debayle in 1979. Josefina Najarro de Sanchez, a Nicaraguan citizen who left her country during the civil war and now resides in Miami, Florida, brings this suit against Banco Central de Nicaragua ("Banco Central"), the central bank of Nicaragua, and Citizens and Southern International Bank ("C & S"), an American commercial bank located in New Orleans, Louisiana, to recover $150,000 on a check drawn in her favor by Banco Central on its account with C & S. Banco Central moves to dismiss, contending that the suit is barred under the FSIA and that I lack personal jurisdiction over it. For the reasons discussed below, I find that there is jurisdiction over this suit and deny Banco Central's motion to dismiss.

In 1971 Sanchez held Certificate of Deposit No. 68–78 (ME) with Banco Nacional de Nicaragua ("Banco Nacional"), a Nicaraguan commercial bank, in the amount of $150,000.[1] Although it was not scheduled to mature until 1982, Sanchez went to Banco Nacional on July 12, 1979 seeking to redeem the certificate immediately. Because Banco Nacional lacked sufficient American dollars on hand to honor the certificate, it asked Banco Central, with which it held an account, for the dollars. Banco Central complied with the request by debiting Banco Nacional's account for an equivalent amount in Cordobas, the Nicaraguan national currency, and issuing Check No. 20110 on its C & S account to Sanchez for $150,000. Soon thereafter, Sanchez left Nicaragua for the United States.

Upon her arrival at Miami, Sanchez attempted to cash the check at a C & S branch in that city, but was told she should come to the New Orleans office. On July 17, 1979 Sanchez visited C & S in New Orleans and presented her check. Officials of the bank initially refused payment on the ground that Banco Central's account had been closed; they later advised Sanchez that although the account was still open, there were insufficient funds to cover the check. When Sanchez presented the check again a few days later, it was returned to her marked "Refer to maker." C & S told Sanchez that because of the turmoil in Nicaragua, it had suspended all payments from the Banco Central account as provided by the Uniform Commercial Code, and that it had been instructed by Dr. Arturo Cruz, the president of Banco Central who assumed office with the installation of the revolutionary junta in mid-July, to stop payments from the account. See Letter from Kenneth E. Moore, President of Citizens and Southern International Bank, to Josefina Najarro de Sanchez, July 20, 1979. Banco Central continues to refuse payment on the check.

Sanchez asserts four causes of action against Banco Central: breach of the duty to honor the check; breach of contract; misrepresentation; and conversion. Banco Central responds that it is immune to suit on any of these claims and that the action must be dismissed as to it.[2]

The FSIA was enacted to bring uniformity to the disposition of legal claims against foreign governments and to make the judiciary, rather than the Department of State, the predominant arbiter of such claims. Before Congress approved the Immunities Act in 1976, courts presiding over suits in which a foreign state invoked sovereign immunity would look to the State Department for guidance. Ostensibly, the Department would follow the "restrictive" approach to foreign sovereign as set out in the "Tate Letter" of 1952, 26 Dept.State Bull. 984. Under that approach, foreign states could not be sued for conduct that was "public," "sovereign," or "governmental," (*jure imperii*), but could be held liable for damages

---

**1.** On a motion to dismiss I must accept as true the plaintiff's allegations. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Menchaca v. Chrysler Credit Corporation*, 613 F.2d 507, 511 (5th Cir. 1980).

**2.** Sanchez asserts three claims against C & S: breach of its duty to honor the check; misrepresentation; and negligence. The legal sufficiency of these claims is not at issue on this motion to dismiss by Banco Central.

arising from their "private" or "commercial" activities (*jure gestionis*). Once the State Department indicated to which category particular conduct belonged, the courts would typically accept the executive determination of immunity as conclusive and dispose of the suits accordingly. *See, e. g., Republic of Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945); *Ex parte Peru*, 318 U.S. 578, 63 S.Ct. 793, 87 L.Ed. 1014 (1943); *Spacil v. Crowl*, 489 F.2d 614 (5th Cir. 1974); *Southeastern Leasing Corp. v. Stern Dragger Belogorsk etc.*, 493 F.2d 1223 (1st Cir. 1974); *Isbrandtsen Tankers, Inc. v. President of India*, 446 F.2d 1198 (2d Cir.), *cert. denied*, 404 U.S. 985, 92 S.Ct. 452, 30 L.Ed.2d 369 (1971). *See also Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes*, 336 F.2d 354, 360 (2d Cir. 1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). Because the State Department is subject to political and diplomatic pressures, however, it often drifted from a strict application of the principle of "restrictive" immunity and gave courts inconsistent advice. Through the FSIA, Congress intended to eliminate the Department's influence on the scope of foreign sovereign immunity, and to regularize the standards used by the judiciary in determining that scope. *See generally* Report of House Judiciary Committee No. 94–1487, *reprinted in* [1976] U.S.Code Cong. & Admin.News 6604 (hereinafter referred to as "House Report" with citations to reprint pages).

The statute sets out as a general principle the immunity of foreign states and their agencies or instrumentalities[3] to suit in American courts, and then provides specific exceptions to that general immunity. 28 U.S.C. § 1604. In the non-admiralty context, there are five exceptions, three of which are applicable to the facts of this case.[4] Section 1605(a), 28 U.S.C., states in part:

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . . .

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

. . . . .

(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state

---

**3.** Both sides to this motion agree that Banco Central is an "agency or instrumentality of a foreign state" within the meaning of the FSIA. 28 U.S.C. § 1603(b). *See* House Report at 6614 ("agency or instrumentality" includes a central bank). *See also Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 500 F.Supp. 320, 321 (S.D.N.Y.1980) (central bank of Nigeria is "agency or instrumentality").

**4.** One exception relates to waiver of immunity. 28 U.S.C. § 1605(a)(1). Sanchez has not alleged waiver, and affidavits by Nicaragua's Secretary of Justice and a Banco Central official indicate that the bank has not waived any immunity it possesses. *See* Affidavit of Carlos Arguello at ¶ 4; Affidavit of Gonzalo Meneses-Ocon at ¶ 10. Another exception relates to property in the United States acquired by succession or gift, or rights in immovable property in this country. 28 U.S.C. § 1605(a)(4).

while acting within the scope of his office or employment; except this paragraph shall not apply to—

(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

Whether Sanchez's claims fall within the exception created by § 1605(a)(2) of the FSIA depends preliminarily on whether Banco Central's conduct giving rise to those claims can be characterized as "commercial activity." The Immunities Act defines "commercial activity" as

either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). The legislative history to the FSIA sheds further light on the meaning of the phrase:

Paragraph (c) of section 1603 defines the term "commercial activity" as including a broad spectrum of endeavor, from an individual commercial transaction or act to a regular course of commercial conduct. A "regular course of commercial conduct" includes the carrying on of a commercial enterprise such as a mineral extraction company, an airline or a state trading corporation. Certainly, if an activity is customarily carried on for profit, its commercial nature could readily be assumed. At the other end of the spectrum, a single contract, if of the same character as a contract which might be made by a private person, could constitute a "particular transaction or act."

As the definition indicates, the fact that goods or services to be procured through a contract are to be used for a public purpose is irrelevant; it is the essentially commercial nature of an activity or trans-

action that is critical. Thus, a contract by a foreign government to buy provisions or equipment for its armed forces or to construct a government building constitutes a commercial activity. The same would be true of a contract to make repairs on an embassy building. Such contracts should be considered to be commercial contracts, even if their ultimate object is to further a public function.

·          ·          ·          ·          ·

The courts would have a great deal of latitude in determining what is a "commercial activity" for purposes of this bill. It has seemed unwise to attempt an excessively precise definition of this term, even if that were practicable. Activities such as a foreign government's sale of a service or a product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents, or its investment in a security of an American corporation, would be among those included within the definition.

House Report at 6615.

■ From its legislative history and the few cases that have interpreted the FSIA, certain principles of the scope of the "commercial activity" exception to foreign sovereign immunity have emerged. First, as is true for all the other exceptions under the FSIA, the burden of demonstrating that the claim does not fall within § 1605(a)(2), *i. e.*, the burden of proof that immunity exists, is upon the foreign state. House Report at 6616; *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1378 (5th Cir. 1980); *Behring International, Inc. v. Imperial Iranian Air Force*, 475 F.Supp. 396, 405 n.9 (D.N.J.1979). This is in contrast to the usual rule that upon challenge, the plaintiff bears the burden of proving that subject matter jurisdiction exists over his claim. *See, e. g., Save Our Cemeteries, Inc. v. Archdiocese of New Orleans*, 568 F.2d 1074, 1076 (5th Cir.) *cert. denied*, 439 U.S. 836, 99 S.Ct. 120, 58 L.Ed.2d 133 (1978); *Rosemound Sand and Gravel Co. v. Lambert Sand and Gravel Co.*, 469 F.2d 416, 418 (5th Cir. 1972).

■ Second, as both the language of the statute and its legislative history make clear, in determining the existence of immunity the *purpose* of the challenged conduct is irrelevant; only the *nature* of the activity giving rise to the claim must be considered. Although this is not a novel principle in the jurisprudence of foreign sovereign immunity, *see* Restatement of the Law, Second, Foreign Relations Law of the United States § 69, Comment a, it marks a departure from pre-FSIA decisions that considered the purpose of a transaction controlling on the question of immunity. *See, e. g., Heaney v. Government of Spain*, 445 F.2d 501, 504 (2d Cir. 1971) (dictum) (foreign government's contract to purchase ammunition or build fortifications for army is governmental rather than commercial act); *Victory Transport, Inc. v. Comisaria General de Abastecimientos y Transportes, supra*, 336 F.2d at 360. (dictum) (purchase of clothing or ammunition for army, building of fortifications and rental of house for embassy not private acts). *See also Gittler v. German Information Center*, 95 Misc.2d 788, 408 N.Y.S.2d 600 (1978) (contract to produce documentary films designed to foster cultural relations between United States and West Germany arises from public act).

■ Third, the applicability of the "commercial activity" exception under § 1605(a)(2) rests not on whether the foreign entity generally engages in commercial conduct, but "on whether the particular conduct giving rise to the claim in question actually constitutes or is in connection with commercial activity, regardless of the defendant's generally commercial or governmental character." *Arango v. Guzman Travel Advisors Corp., supra*, 621 F.2d at 1379. Examples from *Arango* and other cases will illustrate this principle.

In *Arango*, Dominicana, the national airlines of the Dominican Republic, was sued on tort and breach of contract claims arising from the refusal of Dominican officials to permit the plaintiffs to enter the country because of their inclusion on an official list of "undesirable aliens." Dominicana personnel aided immigration officials by forcibly placing the plaintiffs on board a flight out of the country. The court held that to the extent Dominicana employees assisted immigration officials in turning the plaintiffs away, and flying them out of the Dominican Republic, their conduct—"for which [Dominicana] apparently was not compensated"—was not actionable, and the tort claims of false imprisonment and battery arising from the conduct had to be dismissed because of foreign sovereign immunity.

> Dominicana acted merely as an arm or agent of the Dominican government in carrying out this assigned role, and, as such, is entitled to the same immunity from any liability arising from that government's function as would inure to the government, itself.

621 F.2d at 1379. However, the breach of contract and negligence claims which arose from Dominicana's commercial activities as a common carrier were actionable under the FSIA.

> Arangos' complaint also . . . stated claims for breach of warranty and contract based on the miscarriage and non-performance of the vacation tour and the apparent failure of the defendants to refund the price paid for the tour. It further alleged that, because Dominicana knew of the official list of undesired foreigners forbidden to enter the Dominican Republic and because of its high duty of care as a common carrier, Dominicana was negligent in arranging the Arangos' vacation air transportation without ascertaining whether they would even be allowed to enter the Dominican Republic for the purpose of that vacation, or without at least warning them of the potential danger of exclusion based on that list and its attendant costs and consequences. Each of these claims, and the duties alleged therein to have been breached, arose directly from or in connection with the marketing and execution of contracts—*i. e.*, the sale of airline tickets and "tourist cards" necessary to enter [the] Dominican Republic—by Dominicana . . . in the normal course of its airline busi-

ness in the United States. Consequently, while these claims may eventually fail for other reasons, they plainly stem from Dominicana's "commercial activity" in the United States and are, therefore, not barred by sovereign immunity.

621 F.2d at 1379–80.

In *Yessenin-Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y.1978), two press organizations of the Soviet Union were sued for libel. Although § 1605(a)(5)(B) of the Immunities Act exempts libel as an actionable tort, the court reasoned that if the allegedly libelous conduct arose from the commercial activities of the defendants, the suit could proceed. 443 F.Supp. at 855. The court also expressed its firm belief that at least one, and probably both, of the organizations engaged in commercial activity generally. *Id.* at 856 & n.4. Nevertheless, it concluded that because the defendants published the alleged libel in collaboration with other organs of the Soviet government, their conduct giving rise to the plaintiff's claim was governmental and not commercial.

> Such action was not in connection with a contract or other arrangement with a nongovernmental or foreign party, which activity would be found commercial under most circumstances. Rather, it was one instance of a cooperative arrangement with a governmental agency and thus cannot be characterized either as "a regular course of commercial conduct" or as "a particular commercial transaction or act." 28 U.S.C. § 1603(d).

*Id.*

In *Carey v. National Oil Corp.,* 453 F.Supp. 1097 (S.D.N.Y.1978), *aff'd on other grounds,* 592 F.2d 673 (2d Cir. 1979), the court held that the nation of Libya was immune from suit for inducing its oil corporation to breach contracts with other oil companies because

> [i]t is beyond cavil that these actions by Libya were no part of a commercial undertaking; rather, they were deliberate weapons of foreign policy, aimed at influ-

encing the conduct of other nations, or at least punishing undesirable conduct.

453 F.Supp. at 1102. *See also International Association of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries,* 477 F.Supp. 553 (C.D.Cal. 1979) (OPEC oil policies are governmental in nature, so member nations are immune from suit). Finally, in *National American Corp. v. Federal Republic of Nigeria,* 448 F.Supp. 622 (S.D.N.Y.1978), *aff'd,* 597 F.2d 314 (2d Cir. 1979), the court refused to allow the defendant to avoid its commercial obligations on the theory of foreign sovereign immunity. In that case, the court found that the nation of Nigeria had grossly overpurchased cement, and when incoming shipments of the product began clogging its ports and keeping out more needed commodities, the Nigerian government took certain steps to cut the flow of cement imports, including placing an embargo on shipments, repudiating its contracts, and unilaterally ordering its American bank not to honor an irrevocable letter of credit it had caused to be issued. The court held that with respect to claims of breach of contract and repudiation of the letter of credit, notwithstanding the fact that the government was acting to serve the national interest of Nigeria, foreign sovereign immunity was not available because the obligations arose from commercial activities.

In this case, both sides have offered sworn statements by officials of Banco Central and the Nicaraguan government attesting to the governmental or commercial nature of the bank, and to the nature of the particular transaction giving rise to Sanchez's claim. For example, Gonzalo Meneses-Ocon, chief counsel for Banco Central, stated that the bank was created by the Nicaraguan Congress on August 23, 1960 through Decree No. 525 [5] as the central bank of Nicaragua, with its main objective, as defined by the Decree, "to create, promote and keep monetary, exchange and credit conditions favorable to the orderly

---

**5.** Decree No. 525 was published in La Gaceta, Official Journal No. 211, on September 16, 1960, a copy of which is attached to Meneses-Ocon's affidavit as "Exhibit A."

development of the national economy."[6] Accordingly, Meneses-Ocon declared, "Banco Central is not a commercial bank and does not operate with [a] mercantile objective." Affidavit of Gonzalo Meneses-Ocon at ¶¶ 3, 4. Meneses stated further that during the collapse of the Somoza regime in July, 1979, "the banking system of Nicaragua suffered massive and continuing withdrawals of foreign currency such that the international monetary reserves of the Republic were at a critically low level," and that upon assuming power, the Junta ordered C & S to stop payment on any check drawn on its account. *Id.* at ¶¶ 7–9. Bayardo Herrera, a Banco Central counselor, stated that in issuing the check to Sanchez, the bank acted "in its capacity to engage in foreign exchange transactions," and that because the international currency reserves of Banco Central were at a "critical low level" in July, 1979, payment on the check would be "from all viewpoints inconvenient to Banco Central and to the international monetary reserves of the country." Affidavit of Bayardo Herrera ¶¶ 6, 7. Banco Central has also produced a certification by an official of the Junta that his government authorized the stop payment order relayed to C & S. *See* Certification of Emilio Baltodano Cantarero, Minister of the General Secretariat of the Junta de Gobierno de Reconstruccion Nacional.[7]

Sanchez responds with the deposition of Dr. Roberto Incer, the president of Banco Central under the Somoza regime. Incer testified that although Banco Central performed many governmental functions, it also engaged in commercial activities. Deposition of Dr. Roberto Incer at 8. According to Incer, the issuance of the check to Sanchez was "a commercial transaction.... [Banco Central acted] as a bank entity issuing a check against a checking bank as a corresponding bank. This transaction is no different than one that can—any private individual against a checking account in C & S [sic]." *Id.* at 33. At one point in the deposition there was the following exchange:

Q. In utilizing the C & S account, was Banco Central wearing its commercial hat or its Governmental hat?

A. This was just a commercial operation, a banking operation. It was not a Government function.

*Id.* at 19. Incer also testified that Banco Central used its C & S account to pay the

---

**6.** Article 3, Decree No. 525. Article 4 of the Decree lists various functions to be performed by Banco Central:

   a) Control the internal and external value of the national currency;
   b) Control the currency in order to avoid disturbances of local prices, salaries and other activities at a general level;
   c) Regulate, in general, banking credit and orient the credit policies of the State financing institutions;
   d) Promote liquidity and stability of the banking institutions;
   e) Attempt an effective coordination between the monetary and fiscal policies of the State, including investment programs of those public entities able to affect monetary and capital markets;
   f) Function as the sole banking institution in the State with the privilege of currency issuance;
   g) Control and manage the international monetary reserves of the country; and
   h) Act as counselor of economic policy and as state fiscal agent.

**7.** Sanchez argues that because Dr. Arturo Cruz was not officially appointed by the Junta as the new president of Banco Central until July 22,

1979, several days after C & S refused payment on the check, *see* Certification of Emilio Baltodano Cantarero, *supra,* his stop-payment order was made without authority and could not constitute governmental action within the meaning of the FSIA. The short answer to this argument, of course, is that to the extent Dr. Cruz did not exercise governmental power when he instructed C & S to stop payment on the check, the suit against Banco Central must be dismissed since under that circumstance it did not in fact repudiate the check. However, Sanchez also alleges that Banco Central continues to refuse payment on the check, and presumably she is suing because of that continued refusal. As to this period, there is no question but that Dr. Cruz was acting within the scope of his authority.

Moreover, even if Dr. Cruz had not been officially appointed president of Banco Central at the time he gave the stop-payment order, his act was subsequently ratified by Banco Central, and thus was cloaked with governmental authority for purposes of determining Banco Central's liability for the stop-payment order. Restatement of the Law, Second, Agency § 218.

expenses of Nicaraguan students in the United States, to pay for letters of credit for imports, and to pay C & S for principal and interest on loans taken out by C & S. *Id.* at 11–12.

The problem with regarding these statements as probative of the ultimate issue on this motion is two-fold. First, it is not enough for these witnesses merely to offer conclusory descriptions of Banco Central's general character or specific conduct. To be sure, reasonable people may disagree over the proper characterization of what Banco Central did; indeed, some commentators have concluded that the governmental/commercial dichotomy in foreign sovereign immunity law is unworkable because of the conceptual difficulties.[8] But I can decide this motion only upon facts, and not on the basis of a government official's opinion. To the extent that these statements are simply conclusory, I must disregard them.

Second, many of the statements in these affidavits and deposition are irrelevant to my inquiry under the commercial activity exception to the Immunities Act. In accordance with the authorities cited and discussed above, I cannot decide this motion under § 1605(a)(2) on the basis of Banco Central's general character, for just as a governmental entity may nevertheless be engaged in a commercial activity and thus be subject to suit, *see National American Corp. v. Federal Republic of Nigeria, supra,* so may a commercial entity perform a governmental function and avoid liability for claims arising therefrom. *See Arango v. Guzman Travel Advisors Corp., supra; Yessenin-Volpin v. Novosti Press Agency, supra.* It seems clear that Banco Central is imbued with general authority over Nicaragua's financial affairs, and that on occasion it engages in commercial activities through its C & S account; neither fact decides this motion, however. Similarly, whether Banco Central acted to conserve its foreign currency supplies in a time of fiscal crisis when it ordered that Sanchez's check not be honored is nondispositive. Just as Nigeria acted to avoid a national catastrophe by repudiating its obligations in order to stop the flow of cement into its ports, Banco Central may be acting purely in its own sovereign interests by repudiating its debt to Sanchez. But if that debt arose from commercial conduct, as did Nigeria's, then Banco Central cannot invoke immunity against this suit.

■ Despite these shortcomings, there are sufficient facts established by the statements tendered by the litigants, specifically in Incer's deposition, to enable me to characterize Banco Central's conduct in this case as governmental, rather than commercial. In his deposition Incer explained that up until September, 1978, there were no limits placed on foreign currency exchanges, and that Banco Central and commercial banks like Banco Nacional held accounts in American banks like C & S to facilitate transfers from Cordobas to dollars. Incer deposition at 13–15. Then, because of the Carter Administration's decision in 1978 to block Nicaragua's access to international monetary funds, Incer as president of Banco Central introduced the Foreign Exchange Regulation Law. The law placed limits on foreign currency transfers. As Incer explained:

> Before September of '78, the Nicaraguan currency was fully convertible. What that meant, that any citizen of Nicaragua could buy and sell foreign exchange in the amount they required without any restrictions.
>
> With the issue of the foreign currency law of '78, the sale of dollars was limited to some operations prescribed by law. One of these operations was selling dollars to the commercial banks to meet the withdrawal of foreign exchange of dollar deposits of Nicaraguan residents.

*Id.* at 17–18. Incer also explained that the decision to permit foreign exchange transactions was made at the highest level of Banco Central.

---

**8.** *See, e. g.,* Comment, *The Jurisdictional Immunity of Foreign Sovereigns,* 63 Yale L.J. 1148, 1161–62 (1954); Lauterpacht, *The Problem of Jurisdictional Immunities of Foreign States,* 28 Brit.Y.B.Int'l L. 220, 225–26 (1951).

Q. Who was responsible at Banco Central for supervising the handling of such foreign exchange?

A. The day-to-day operation was carried out through the assistant manager of the Foreign Exchange Department of the Central Bank of Nicaragua, but the overall policy was supervised by myself, according to instructions given by the Board of Directors of the Central Bank of Nicaragua and within the authorization given by the foreign exchange law of Nicaragua.

Q. While you were the president, had you set up any procedures for handling foreign exchange such as with respect to withdrawal of dollar deposits?

A. There were general procedures for the Foreign Exchange Department of Central Bank to follow. There [were] administrative procedures and general rules issued by either the Board of Directors or by myself, but in May of—in June of '79, given that the dollar deposits of the Central Bank were very low, I asked the assistant manager of the Foreign Exchange Department of Central Bank to check every operation of selling dollars with myself.

*Id.* at 16–17.

When Banco Nacional requested that it be sold dollars to redeem Sanchez's certificate of deposit, Incer himself authorized the transaction:

Q. When did you first become aware of that certificate of deposit?

A. I received a phone [call] from Mr. Herrera that there was a request from the Nacional Bank of Nicaragua, Banco Nacional de Nicaragua, to buy dollars in the Central Bank of Nicaragua to meet a withdrawal of the dollar deposit held by Mrs. Sanchez in the Banco Nacional de Nicaragua.

Q. When you received that communication, what did you tell Mr. Herrera?

A. I instruct[ed] Mr. Herrera to carry out this transaction and to sell the dollars to the Nacional Bank of Nicaragua.

Q. What did Mr. Herrera say?

A. He carried [out] the transactions.

*Id.* at 19–20.

In addition to explaining the procedures for approving foreign exchange transactions, Incer also testified about the criteria for evaluating requests for dollars:

Q. Did you ever turn down a request to buy dollars?

A. Some of them could be requested—for example, if there was a request for a dollar that I considered from the Nicaraguan Government—that I considered was not the priority, I [would call] the Minister of finance and say, "We are going to put this order on a waiting list because we have another priority to meet."

Q. But then you would fill it when you would get the dollars?

A. Yes.

Q. Was there ever a request for a purchase of dollars that you did not ultimately acquiesce in or agree to?

A. Coming from whom?

Q. From anyone.

A. Well there was some dollars, a request for sales of dollars, that were not authorized by law, and they had to be refused.

Q. But that was the reason? Because they were not authorized by law?

A. This is the main reason. They were not authorized by law.

Q. I take it that a request by Banco Nacional for dollars was authorized by law.

A. That was authorized by law.

Q. Was there ever a request by a private bank to buy dollars that was refused by the Central Bank?

A. All of the dollars were first acquired by the commercial banks of Nicaragua to meet the needs authorized by law, and the excess was passed to the Central Bank of Nicaragua.

What happened—that at the end of May of '79, all the commercial banks ran out of dollar deposits, and the only dollars in the country were in the Central Bank of Nicaragua.

Q. But my question was: Was there ever a request by a private bank to buy dollars that was turned down by Banco Central?

A. No. They didn't have to request. According to the mechanical procedure, they used to buy dollars from the individuals and sell dollars to meet the transaction authorized by law, and they could sell the excess to the Central Bank of Nicaragua.

Q. Are you telling me that Banco Central was obligated to buy and sell dollars as desired by the private banks? Is that the point you are making here?

A. The Central Bank no [sic] was obligated to sell dollars to the private bank when they requested for private transactions.

Q. Banco Central was required to abide by a private bank's request; is that correct?

A. Yes.

Q. So, the only requests that were not honored were those that were not permitted by law; is that right?

A. That's right.

Q. Why did you want to know about all these requests?

A. Because the low level of foreign exchange. There was not enough to meet all the demands that [were] represented at that time in the Central Bank of Nicaragua.

Q. Why was Banco Central required to honor requests by private banks to buy dollars?

A. Why? Because the Central Bank—just as I say, the Central Bank has to keep a fixed exchange rate between the Cordoba and the dollar, so any excess amount—the Central Bank is obliged to keep a fixed exchange rate within the Cordoba, the national currency of Nicaragua, and the dollar, so any excess supply of dollars that were in the market and the bank did not want to acquire it, they sold it to the Central Bank and the Central Bank had to meet any excess demands that were in the market so that this exchange rate should be kept fixed.

Q. That related to both buying and selling dollars?

A. Yes.

Q. Central Bank's function is to buy and sell dollars from private banks in order to maintain a stable exchange rate?

A. That's right.

Q. I believe you told us before that you did not really concern yourself with the relationship between the private bank and its customer in the transaction that created the need for the dollars; is that right?

A. That's right.

Q. Your sole interest was in the maintenance of the stability of the exchange rate; is that correct?

A. That's right.

Q. That is what was happening in this transaction, when Banco Nacional came and asked to buy $150,000 worth of dollars?

A. That's right.

Q. Is that correct?

A. That's correct.

*Id.* at 79–83.

From this testimony, it is clear that Banco Central was not engaged in a commercial venture when it exchanged dollars for Cordobas upon the request of Banco Nacional. Clearly Sanchez was not Banco Central's customer, since her certificate of deposit was held with Banco Nacional and not with it. Banco Central earned no fee from the transaction, *id.* at 13, and as Incer testified it was not even interested in the dealings between Banco Nacional and Sanchez. Banco Central's function in this matter—the maintenance of foreign exchange rates through regulation of foreign currency transactions—was not commercial, but was governmental.

I am aware that in *National American Corp. v. Federal Republic of Nigeria, supra,* the court held that a repudiation of a letter of credit issued by a foreign central bank through an American bank did not give rise to a claim under the "commercial activity" exception to the FSIA. *See also Texas Trading & Milling Corp. v. Federal Republic*

*of Nigeria*, 500 F.Supp. 320 (S.D.N.Y.1980); *Verlinden B.V. v. Central Bank of Nigeria*, 488 F.Supp. 1284 (S.D.N.Y.1980).[9] However, in those cases the letters of credit were issued as the culmination of a series of commercial transactions involving the purchase of cement by the Nigerian government. Here, by contrast, although the relationship between Sanchez and Banco Nacional was commercial, Banco Central's role in that relationship was no different than the role any government plays in facilitating business transactions between its citizens through regulation or licensing. Just as a corporation may not sell shares of its stock without complying with applicable securities laws and obtaining necessary licenses or permits, Banco Nacional could not redeem Sanchez's certificate of deposit without obtaining Banco Central's approval to exchange Cordobas for dollars. Banco Central's C & S check was a necessary element of the commercial transaction between Sanchez and Banco Nacional, but it was not issued as part of any commercial function performed by Banco Central, and consequently cannot form the basis for suit under § 1605(a)(2).

Sanchez also relies on § 1605(a)(3) for jurisdiction over her claim. That exception to immunity relates to suits involving "rights in property taken in violation of international law." [10] Under this exception, the property or the property exchanged for it must be (1) present in the United States and used in connection with a commercial activity carried on in this country by the foreign state; or (2) be owned by an agency or instrumentality of the foreign state which is engaged in a commercial activity in the United States. Under the analysis presented above, to the extent Banco Central holds funds with C & S to facilitate foreign currency exchanges, it does not hold property that is used in connection with a commercial activity. However, "[u]nder the second category, the property need not be present in connection with a commercial activity of the agency or instrumentality." House Report at 6618. Therefore, if Banco Central conducts commercial activities in the United States, it may be sued on a theory of confiscation in violation of international law even though the dollars for which Sanchez's certificate of deposit was exchanged are not held in connection with such commercial activities.

From Incer's testimony, it is clear that Banco Central used the C & S account as part of certain commercial activities conducted in the United States. Checks from the C & S account were used to pay for letters of credit issued through C & S for Nicaraguan imports and to pay for principal

---

**9.** The courts in these cases ultimately dismissed the claims against the foreign states on the ground that personal jurisdiction was lacking. *But see Decor by Nikkei International v. Federal Republic of Nigeria*, 497 F.Supp. 893 (S.D.N.Y.1980) (holding that personal jurisdiction existed under similar circumstances). Banco Central also raises this objection on this motion. Because I find that § 1605(a)(2) is inapplicable to this case, I need not consider the issue of personal jurisdiction under that provision; I do consider the argument under § 1605(a)(3), however. *See* note 11 *infra*.

**10.** The term "taken in violation of international law" would include the nationalization or expropriation of property without payment of the prompt and adequate and effective compensation required by international law. It would also include takings which are arbitrary or discriminatory in nature. Since, however, this section deals solely with the issues of immunity, it in no way affects existing law on the extent to which, if at all, the "act of state" doctrine may be applicable. *See* 22 U.S.C. 2370(e)(2).

House Report at 6618 (footnote omitted). The "act of state" doctrine precludes an American court from sitting in judgment of public acts committed by a foreign sovereign within its own territory. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). *See Arango v. Guzman Travel Advisors Corp., supra*, 621 F.2d at 1380–81. It does not extend to confiscation of property situated in the United States, however. *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021 (5th Cir.), *cert. denied*, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972); *Republic of Iraq v. First National City Bank*, 353 F.2d 47, 51 (2d Cir. 1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). Because Sanchez alleges that her right to property in this country, the $150,000 in Banco Central's C & S account, has been wrongfully confiscated, the "act of state" doctrine has no application to this case.

and interest on credit extended to Banco Central by C & S. Incer at 11–12. The account was also used to collect all other American checks tendered to Banco Central. *Id.* at 11.

The FSIA defines a "commercial activity carried on in the United States by a foreign states" as "commercial activity carried on by such a state and having substantial contact with the United States." 28 U.S.C. § 1603(e). According to the Immunities Act's legislative history, examples of a commercial activity include

> import-export transactions involving sales to, or purchases from, concerns in the United States ... and an indebtedness incurred by a foreign state which negotiates or executes a loan agreement in the United States or which receives financing from a private or public lending institution in the United States. ...

House Report at 6615–16. Under this standard, it appears from Incer's testimony that Banco Central engaged in commercial activities through its C & S account within the meaning of the FSIA.

In reaching this conclusion, I must distinguish the instant case from *Verlinden B.V. v. Central Bank of Nigeria, supra,* in which the court held that the mere issuance of a letter of credit through an American bank, even if part of other financial ties to the bank, was insufficient to constitute a "commercial activity carried on in the United States by a foreign state" within the meaning of the Immunities Act. Although *Verlinden* approached the issue as one of personal jurisdiction, which Banco Central contends is lacking in this case, the analysis is the same because the FSIA makes the court's personal jurisdiction coterminous with its subject matter jurisdiction over the claim asserted against the foreign state. 28 U.S.C. § 1330(b).[11] The court in *Verlinden* dismissed the suit against the foreign state because it held that there were insufficient contacts between the United States and the controversy to support jurisdiction under the FSIA. *See* 488 F.Supp. at 1293–1300. However, that conclusion was reached under § 1605(a)(2) of the Immunities Act; under that exception to foreign sovereign immunity, the cause of action must arise from the foreign state's commercial activities in the United States. *See* 28 U.S.C. § 1605(a)(2); *Verlinden B.V. v. Central Bank of Nigeria, supra,* 488 F.Supp. at 1295–96. *See also Harris v. VAO Intourist, Moscow,* 481 F.Supp. 1056 (E.D.N.Y.1979). Section 1605(a)(3), by contrast, permits a court to exercise jurisdiction over the for-

---

11. 28 U.S.C. § 1330 provides:

(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection 1608 of this title.

(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605–1607 of this title.

I acknowledge that Incer's testimony, standing alone, is not particularly strong evidence of the scope and nature of Banco Central's commercial activities in the United States. However, because the burden of proof on the defense of foreign sovereign immunity is upon Banco Central, *see* p. 903 *supra,* and it has failed to present evidence rebutting Incer's testimony, I am compelled to find in favor of Sanchez on the issue.

I also acknowledge that generally the burden of proof on the existence of personal jurisdiction, like subject matter jurisdiction, falls upon the plaintiff. *Familia De Boom v. Arosa Mercantil, S.A.,* 629 F.2d 1134, 1138 (5th Cir. 1980); *Product Promotions Inc. v. Cousteau,* 495 F.2d 483, 490 (5th Cir. 1974); *Jetco Electronic Industries, Inc. v. Gardiner,* 473 F.2d 1228, 1232 (5th Cir. 1973). However, because the FSIA incorporates the elements of personal jurisdiction into its grant of subject matter jurisdiction, and the foreign state must bear the burden of proof that subject matter jurisdiction is lacking, a plaintiff suing under the Immunities Act is necessarily relieved from his duty to prove that the defendant foreign state is subject to the personal jurisdiction of the court. Therefore, because Banco Central has failed to prove that Sanchez's claim does not arise under § 1605(a)(3), its contention that personal jurisdiction is lacking is also without merit.

eign state on a claim of confiscation so long as the state's agency or instrumentality holds the property allegedly confiscated, or property exchanged for it, and conducts commercial activities in the United States, even if the property is not used in connection with those commercial activities. House Report at 6618. Thus, unlike the court in *Verlinden,* I may consider *all* of Banco Central's contacts with this country, and not just those giving rise to the claim asserted by Sanchez.

Moreover, in *Verlinden* the court emphasized that the repudiated letter of credit was but a peripheral part of the underlying controversy between the parties and had no substantial connection with the United States.

> [T]he underlying activity which gave rise to [the plaintiff's] claim of anticipatory breach of the letter of credit occurred outside the United States. The parties are foreigners. Plaintiff, a Dutch corporation, negotiated and executed the cement contract in Nigeria. Shipment of the cement was to be made from ports in Europe. Delivery was to be made to Nigeria. The work was subcontracted to Interbuco, a European concern. The express terms of both the contract and the credit provide for payment ultimately to be made in the Netherlands through Slavenburg's Bank. The parties agreed to resolve all disputes by applying foreign law in a foreign tribunal.
>
> Like the contract, the credit involved activity carried on or consummated overseas. It was established abroad by a foreign bank; was to be advised abroad, to another foreign bank; and named a foreign beneficiary. It adopted many of the contract's substantive provisions, which were to be performed exclusively in Europe and Nigeria by foreign parties. Although it contained no choice of law or forum provisions, it can hardly be argued that the issuing bank (the defendant) and the beneficiary (the plaintiff) intended to invoke the benefits and privileges of American law, or to select an American forum for the resolution of disputes arising out of the credit. . . .

488 F.Supp. at 1294. By contrast, the entire transaction between Sanchez and Banco Central was firmly linked to the United States, for the only purpose Banco Central served by issuing a check on its C & S account to Sanchez was to make American dollars available to her in this country. Unlike *Verlinden,* the facts in this case make clear that the United States was the "focal or end-point in the transaction." *See* 488 F.Supp. at 1297. I therefore conclude that jurisdiction over Sanchez's claim exists under § 1605(a)(3) of the Immunities Act.

I also find that jurisdiction exists under § 1605(a)(5), which denies immunity to foreign states sued for tortious conduct that causes, *inter alia,* damage to or loss of property in the United States, notwithstanding Banco Central's contention that this provision is inapplicable to Sanchez's claim for three reasons. First, § 1605(a)(5)(B) expressly exempts misrepresentation from those torts that are actionable under the FSIA. Accordingly, Sanchez would be left with her claim of conversion. Banco Central argues that the conversion count in Sanchez's complaint is merely an artful recharacterization of her misrepresentation claim, and should similarly be dismissed. However, the claims of misrepresentation and conversion are distinct causes of action, consisting of different factual elements. To prove misrepresentation, Sanchez would have to show that Banco Central falsely but knowingly represented a fact designed to induce some act or omission by Sanchez, that she reasonably relied on the false act, and that as a result she sustained damages. Restatement of the Law, Second, Torts § 525. The wrongful conduct, therefore, would have had to occur at the time that Banco Central issued the check, when Banco represented to Sanchez that it would honor its obligation to pay her the $150,000. By contrast, to prove conversion Sanchez would only have to prove that having received the proceeds from her certificate of deposit, Banco Central wrongfully retained that property by stopping payment on the C & S check. Restatement, *supra,* § 222a. Sanchez would not have to show that the

wrongful conduct occurred when the check was issued, for the tort of conversion generally includes a wrongful retention of chattel that initially was rightfully received. *See id.* § 237 and Illustration 13. It specifically includes the wrongful prevention of the exercise of intangible rights represented by a document, such as a negotiable instrument, even if the document itself is not converted. *Id.* § 242(2). Thus, nothing in the proviso of § 1605(a)(5)(B) prevents Sanchez from proceeding on her claim of conversion.

Second, Banco Central contends that § 1605(a)(5) requires that the wrongful act be committed within the jurisdiction of the United States, and that since the stop-payment order was issued by Dr. Cruz from Managua, Nicaragua, the provision does not apply to Sanchez's claim. Although § 1605(a)(5) contains no such language, and at least one court has refused to recognize a requirement that the tortious conduct as well as its effect take place within the boundaries of this country, *see Letelier v. Republic of Chile,* 488 F.Supp. 665, 674 (D.D.C.1980), the legislative history of the FSIA does state that "the tortious act or omission must occur within the jurisdiction of the United States." House Report at 6619. Assuming *arguendo* that Banco Central is correct, the evidence shows nevertheless that when Dr. Cruz instructed C & S not to honor checks drawn on the Banco Central account, he was in Washington, D.C.,[12] and thus did commit the allegedly tortious act in this country.

Banco Central's third argument must also be rejected. It contends that liability under § 1605(a)(5) must be limited to tortious conduct resulting in "casualty-type" damages, *i. e.,* physical harm to the person or property. However, there is nothing in the language of § 1605(a)(5) or its legislative history that indicates such a narrow exemption to immunity from suits for tortious conduct. Section 1605(a)(5) provides that the foreign state shall not enjoy immunity in cases *not otherwise encompassed in paragraph (2) above,* in which money damages are

sought against a foreign state for personal injury or death, or damage to *or loss of property,* occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment. . . .

(Emphasis added.) Clearly Sanchez alleges a loss of property, and, as I concluded above, her claim is not encompassed by § 1605(a)(2) since it does not arise from any commercial activity performed by Banco Central. The legislative history demonstrates that § 1605(a)(5) was intended to cover a broad scope of tortious conduct:

> (a)(5) *Noncommercial torts*—Section 1605(a)(5) is directed primarily at the problem of traffic accidents *but is cast in general terms as applying to all tort actions for money damages, not otherwise encompassed by section 1605(a)(2).*
>
> .   .   .   .   .
>
> The purpose of section 1605(a)(5) is to permit the victim of a traffic accident *or other noncommercial tort* to maintain an action against the foreign state to the extent otherwise provided by law.

House Report at 6619–20 (emphasis added). Furthermore, if Banco Central's interpretation of liability under § 1605(a)(5) were correct, then subsection (B) would be superfluous, since many of the torts enumerated therein—malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, and interference with contract rights—also arise from conduct not causing "casualty-type" injuries, but causing instead purely monetary losses. The fact that Congress deemed it necessary to exclude certain non-casualty torts, but not all such torts like conversion, indicates the scope of the general exemption to immunity under § 1605(a)(5). I find that Sanchez's claim falls within the exemption created by § 1605(a)(5).[13]

Finally, although not raised by Banco Central, still another theory might be ad-

---

**12.** *See* Response to Plaintiff's Request for Admission No. 17; Supplemental Response to Plaintiff's Request for Admission No. 18. *See also* note 7 *supra.*

**13.** Banco Central has not argued that the decision to stop payment on the C & S check was a discretionary function and therefore not actionable under § 1605(a)(5)(A); even if it were, my

vanced to defeat jurisdiction over Sanchez's claim, and I should briefly address it. Given that I have found that Banco Central's conduct in this matter was governmental and not commercial, it could be argued that the bank necessarily enjoys immunity because the FSIA merely codified the "restrictive" approach to foreign sovereign immunity adopted by the Tate Letter. This theory has been raised before another court and rejected there with good reason. *Letelier v. Republic of Chile, supra.* Although according to its legislative history the Immunities Act codified the "restrictive" approach, House Report at 6605, that same history makes clear that a "public act" of a foreign state, for which it enjoys immunity, is "an act not within the exceptions in section 1605–1607." *Id.* at 6616. Thus, the FSIA goes further than the governmental/commercial dichotomy of the "restrictive" approach. Although claims arising from commercial activities are actionable under § 1605(a)(2), so are certain claims of expropriation under § 1605(a)(3), and certain torts under § 1605(a)(5). Even if the conduct giving rise to these claims is "governmental," Congress has concluded that it should be actionable because of its grievous nature and its connection to the United States. Clearly in the context of the sovereign immunity of the United States, official conduct is not immune from suit simply because it is "governmental." *Indian Towing Co. v. United States,* 350 U.S. 61, 67–68, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1953); *In re Franklin National Bank Security Litigation,* 445 F.Supp. 723, 729 (E.D.N.Y.1978). To the extent that Congress intended that some governmental decisions should not be subject to judicial review, it created an exception to the general waiver of sovereign immunity through the discretionary function provision. *See* the Federal Tort Claims Act, 28 U.S.C. § 2680(a). It cannot be insignificant that in enacting the Immunities Act, Congress created the same exception. *See* 28 U.S.C. § 1605(a)(5)(A); House Report at 6620. Instead, it is clear that the specific provisions of the FSIA, and not any generalized notions of "governmental" versus "commercial" conduct, govern the amenability of foreign states to suit in American courts. *See Letelier v. Republic of Chile, supra,* 488 F.Supp. at 672.[14]

Accordingly, because Sanchez's claim falls within the exceptions to foreign sovereign immunity created by §§ 1605(a)(3) and 1605(a)(5) of the FSIA, jurisdiction exists, and Banco Central's motion to dismiss is DENIED.

alternate holding that jurisdiction exists under § 1605(a)(3) requires that I deny Banco Central's motion to dismiss.

14. Similarly, other provisions of the FSIA that limit the availability of attachment and execution of certain property owned by the foreign state do not of their own force affect the scope of foreign sovereign immunity. Banco Central notes that § 1611(b)(1) exempts from attachment or execution property owned by "a foreign central bank or monetary authority held for its own account," and argues that this "evinces Congressional recognition of the distinctly governmental nature of the activities of foreign central banks and the funds held in this country to facilitate such governmental acts." Banco Central's Memorandum in Support of Motion to Dismiss, p. 21. However, the legislative history belies such an expansive interpretation of Congress' intent. Section 1611(b)(1) was enacted simply to prevent the discourage-

ment of the deposit of foreign funds in the United States and to avoid "significant foreign relations problems" that would be caused if judgments were executed against the reserves of foreign states. House Report at 6630. As I have concluded, Banco Central's conduct in this matter was governmental, but it has also engaged in commercial activities and allegedly tortious conduct that bring it within the exceptions of §§ 1605(a)(3) and 1605(a)(5). If Congress had intended to immunize foreign central banks from all suits, it could easily have done so through explicit language. Instead, it chose to enact general standards to determine immunity that apply to all agencies or instrumentalities of foreign states, including central banks, and then to limit a plaintiff's ability to enforce a judgment in special circumstances for extrinsic policy reasons. Section 1611(b)(1) means no more than it says.