**Edward C. CAREY and New England Petroleum Corporation, Plaintiffs,**

v.

**NATIONAL OIL CORPORATION and Libyan Arab Republic, Defendants.**

**No. 77 Civ. 3125 (KTD).**

United States District Court,
S. D. New York.

June 15, 1978.

Eaton, Van Winkle, Greenspoon & Grut-
man, New York City, for plaintiffs; John
Van Voorhis, Samuel N. Greenspoon, New
York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle,
New York City, for defendants; John E.
Sprizzo, Peter E. Fleming, Jr., Keith Hi-

ghet, George Kahale, III, Joseph D. Pizzurro, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

This action to recover damages for breach of contract to supply petroleum products, and excess charges paid pursuant to contracts allegedly executed under duress, is before me on defendants' Motion To Dismiss on jurisdictional grounds. Because the defendants are protected by sovereign immunity, the Motion To Dismiss is granted.

## I

## FACTUAL BACKGROUND

Plaintiff New England Petroleum Corporation ("Nepco") is a New York corporation which, at all relevant times, was engaged in marketing petroleum products to utilities on the East Coast. Two subsidiaries of Nepco, Grand Bahama Petroleum Co. ("Petco") and Antco Shipping Co. ("Antco")— both Bahamian corporations—played important roles in this drama. Plaintiff Edward C. Carey ("Carey") is allegedly Petco's and Antco's assignee.

### A. The Oil Contracts

In 1968, Nepco's subsidiary Petco sought to secure a supply of the low-sulfur fuel it needed to satisfy Nepco's customers in New York and New Jersey. Libyan oil proved to be ideal for Petco's purposes; a complicated series of transactions ensued, whereby the oil pumped from a Libyan concession jointly owned by California Asiatic Oil Co. ("Calasia")—a subsidiary of Standard Oil of California—and a Texaco subsidiary, would be sold first to Chevron Oil Trading Co. ("Cot"), Calasia's affiliate; then to Petco; and finally to Nepco and its customers.

On September 1, 1973, the Socialist People's Libyan Arab Jamahirya ("Libya") na-

tionalized 51 per cent of a number of foreign-owned oil concessions, including Calasia's.[1] Although the remaining 49 per cent was not nationalized until February of 1974, Cot acted immediately in 1973 to terminate its contractual obligations to Petco, invoking the "force majeure" clause of its contract.

In March of 1970, Libya had created the National Oil Corporation ("NOC"), a corporation wholly owned by the Libyan government and empowered to engage in all facets of the petroleum business, including primarily the production and sale of crude oil. NOC—like foreign companies such as Calasia—owned concessions permitting the extraction of oil from a given region. The Calasia concessions nationalized in 1973 and 1974 were transferred by Libya to NOC.

Anxious to safeguard its supply of Libyan oil, Petco entered into two contracts with NOC, on September 10 and 12, 1973, to replace its abrogated arrangements with Cot. These called for a price of $4.90 and $5.20 per barrel, respectively, both prices being higher than the price under the Cot contract.

The petroleum picture in the Middle East was, of course, tremendously complicated by the outbreak of the "Yom Kippur War" in October of 1973. Oil producing nations, including Libya, imposed an embargo on petroleum exports to the United States, the Netherlands and the Bahamas. Moreover, production was cut back, and all Libyan concessionaires—NOC as well as private owners—were ordered to conform to reduced schedules. As a result, the world price of oil climbed steeply while the supply available fell. In response to this altered situation, NOC invited all its potential customers to Tripoli to submit bids for new contracts to supersede any then in effect.

Petco proposed to NOC a significant increase in its purchases, at a price of $14.14

---

1. An arbitrator appointed by the International Court of Justice subsequently found the nationalizations improper. However, the arbitrator's award and final order have been sealed pursuant to the settlement agreement between Libya, Texaco and Standard Oil of California. Because of my disposition of the immunity issue, I need not address the question of the propriety of Libya's actions.

per barrel. (The bid indicated that Petco would "meet the 'going-price.'") Negotiations continued until January 29, 1974, when a contract was executed calling for a price of $16.00 per barrel for the first quarter of 1974, to be adjusted subsequently.

Plaintiffs allege that this contract was conditioned on performance of the September 1973 agreements, and that NOC never carried out this condition. In fact, oil was delivered to Petco throughout 1974 and 1975, under the 1974 contract, for refining in Italy (during the embargo) and the Bahamas. In December of 1975, Petco failed for the first time to pay on time for a previously delivered cargo of oil. Despite attempts to reach an accommodation concerning both past-due payments and future deliveries, Petco.was unable to satisfy NOC. On May 24, 1977, NOC sought by petition in the Bahamas to have Petco's affairs wound up.

### B. The Charter Contracts

On December 9, 1973, Antco agreed in Tripoli to charter two tankers owned by General Maritime Transport Organization ("GMTO"), a wholly government-owned Libyan entity succeeded in 1975 by General National Maritime Transport Co. ("GNMTC"). Plaintiffs allege that these charters were extorted at an artificially high rate as the price of NOC's continued performance of its September 1973 agreements with Petco.

Antco took possession of the tankers in Japan in 1974. As the market rate for vessel charters fell, Antco became progressively more dissatisfied with the terms of its contracts, and sought to negotiate a reduction in price. By agreement, a panel of shipbrokers was formed to decide on the proper rate of hire; its decision was announced on February 10, 1977. Though the contract rate was ordered lowered, Antco declined to pay what was due even under these new terms, and surrendered the tankers at Curaçao in April of 1977. GNMTC has instituted liquidation proceedings against Antco in the Bahamas.

2. A "foreign state" is defined in 28 U.S.C.A. § 1603 (West 1978 Supp.) as including an

## II

### THE CLAIMS

This action was commenced on April 21, 1977, in New York Supreme Court, and removed to this Court pursuant to 28 U.S.C. § 1441(d). The damages sought now amount to some $1.6 billion.

Claims 1 and 2 are addressed by Carey (as assignee of Petco) to the alleged breach by Libya and NOC of the agreements of September 10 and 12, 1973, respectively. Claim 3 is Carey's attempt to recover from Libya and NOC excessive amounts allegedly obtained by duress under the contract of January 29, 1974. Claim 4 is brought by Nepco against Libya and NOC, charging intentional frustration of the 1973 agreements of which Nepco was, allegedly, a known beneficiary.

Claim 5 is Carey's claim (as Antco's assignee) against Libya and NOC for excessive payments allegedly obtained by duress under the charter contracts. NOC is joined because it is claimed to have extorted these payments as the price of its own performance. Claims 6 and 7 are pressed by Carey (as Petco's assignee) and Nepco, respectively, solely against Libya, charging deliberate inducement of NOC's breach of the 1973 agreements. Finally, Claim 8 accuses both Libya and NOC of having deliberately caused the circumstances in which the original supply contracts with Cot could not be fulfilled.

## III

### DISCUSSION

■ The question when a foreign state may be sued in a United States Court has been given a comprehensive statutory answer by the Foreign Sovereign Immunities Act of 1976, Pub.L.No.94–583, 90 Stat. 2892 (1976) (codified at 28 U.S.C.A. §§ 1330(d), 1602–11 and *passim*). Jurisdictional immunity to suit is extended to foreign states [2] in

"agency or instrumentality of a foreign state"; this, in turn, is defined as a separate legal

all cases save those specifically enumerated in the Act, or covered by an existing international agreement. Since I find that none of the claims against Libya or NOC fall within the enumerated exceptions, I must dismiss this suit as being outside the jurisdiction of the Court.

### A.  Claims 1–4

■  Neither Libya nor NOC is amenable to suit in a United States court on any claim concerning the contracts between Petco and Cot or Petco and NOC. There is room for substantial doubt whether, in fact, Libya itself was at all involved in either the abrogation of the old contracts, or their replacement—allegedly under duress—by the new ones. However, even assuming for the purposes of this motion that Libya's actions and motives were as asserted by plaintiffs,[3] Libya and NOC are not in this case stripped of the sovereign immunity that generally attaches to them.

The only exception to immunity that could even arguably apply to the transactions here is that found in 28 U.S.C.A. § 1605(a)(2): "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere  .  .  .  [which] act causes a direct effect in the United States."

■  It is plain from the legislative history of the Foreign Sovereign Immunities Act that "[t]he requirements of minimum jurisdictional contacts and adequate notice are embodied" in the Act. "Cf. International Shoe Co. v. Washington, 326 U.S. 310 [66 S.Ct. 154, 90 L.Ed. 95] (1945). . . ." H.Rep.No.94–1487, 94th Cong., 2d Sess. 13 (1976). The language of 28 U.S.C.A. § 1605(a)(2) must therefore be read in light of International Shoe and "minimum contacts."

■  If anything is apparent about the nature of the contacts between Libya and the United States in 1973–74, it is that Libya consciously sought to reduce those contacts to nothing, if at all possible. None of the contracts at issue involved any United States corporations; in fact, refineries in the Bahamas were, for a time, abandoned in favor of Italian sites, simply because too much oil was reaching the United States through the Bahamas.

Even with respect to the non-embargo period, it is evident that nothing Libya or NOC did concerning the 1968, 1973 or 1974 contracts could possibly have had a direct effect in the United States of a kind that would satisfy International Shoe. Even if, as plaintiffs allege, the Libyan government was aware that the Bahamian subsidiaries were being used merely as conduits to supply Nepco and its customers, and even if— as seems likely—the 1974 embargo was designed to have a direct effect of a sort on the United States, the effect in question (deprivation of oil to Bahamian corporations) is not one that creates the requisite minimum contacts. There has been absolutely no attempt by Libya or NOC to avail itself of any of the protections or privileges afforded by the United States—rather, in fact, the reverse. See Hanson v. Denckla, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1953). Accordingly, claims 1–4 must be dismissed against both Libya and NOC.

### B.  Claim 5

■  While its specific context differs from that of claims 1–4, claim 5 presents only the same legal question as do those claims: Did the alleged misconduct with respect to the charter contracts have a direct effect in the United States? Naturally, the answer, as well, is the same: No.

---

person, a majority of whose ownership interest is owned by a foreign state, and which is neither a United States citizen nor a creation of a third nation. By this definition, NOC is clearly a "foreign state" for jurisdictional immunity purposes. Compare Edlow Internat. Co. v. Nuklearna Elektrarna Krsko, 441 F.Supp. 827 (D.D.C.1977).

**3.** Since I make this assumption, I need not consider the significance of the cases and legislative material concerning the conclusive effect of a foreign government's determination as to the interrelationship of and attribution of responsibility between two foreign entities such as Libya and NOC.

No more through GMTO and GNMTC than through NOC did Libya consciously involve the United States in any of its commercial undertakings, to any extent whatsoever. NOC's involvement, if any, likewise cannot be said to have had a direct effect in the United States. The due process standard embodied in 28 U.S.C.A. § 1605(a)(2) bars this claim against both Libya and NOC.

## C. Claims 6 and 7

These claims, asserted against Libya alone, allege in effect that Libya induced NOC's breach of the 1973 oil contracts. This refers, presumably, to the orders that franchisees cut back their production. It is beyond cavil that these actions by Libya were no part of a commercial undertaking; rather, they were deliberate weapons of foreign policy, aimed at influencing the conduct of other nations, or at least punishing undesirable conduct.

The structure of the Foreign Sovereign Immunities Act leaves no question that non-commercial activities of a foreign state will be treated with the same deference to which they were entitled before 1976.[4] The distinction between acts of a sovereign nature and acts of a commercial nature is one dating back to antiquity, and one which was recognized in the famous "Tate letter" to Acting Attorney General Perlman, 26 Dept.State.Bull. 984 (1954). Sovereigns are "traditionally . . . quite sensitive" about external inquiries into the way in which they conduct their foreign policy. *See Victory Transport, Inc. v. Comisaria General*, 336 F.2d 354, 360 (2d Cir. 1964), *cert. denied*, 381 U.S. 934, 85 S.Ct. 1763, 14 L.Ed.2d 698 (1965). Therefore, I conclude that this was not the kind of act to which the exceptions in 28 U.S. C.A. § 1605 were meant to apply.

Furthermore, even if the relevant alleged acts by Libya are not viewed as sovereign in nature, they constitute at most a tortious interference with contract rights. This cat-egory of claims is specifically excluded from the scope of exceptions to the Foreign Sovereign Immunities Act, 28 U.S.C.A. § 1605(a)(5)(B). Viewed in any possible light, claims 6 and 7 must be dismissed.

## D. Claim 8

Claim 8 appears to be an omnibus claim, in which plaintiffs attempt to hold both Libya and NOC responsible for the entire series of events described in Part I *supra*, from 1968 to the present. Its contours, therefore, are somewhat nebulous.

Since all of claim 8 appears to turn on the nationalizations in 1973 that induced Cot to terminate its contract with Petco, I must determine whether either Libya or NOC may be questioned in this Court with respect to those nationalizations. The answer is no, for a combination of all of the reasons discussed above.

First, nationalization is the quintessentially sovereign act, never viewed as having a commercial character. *See, e. g., Victory Transport, Inc., supra*, 336 F.2d at 360. Second, the activity complained of constitutes, if anything actionable, an interference with contract rights. Finally, I can again discern no direct effect in the United States flowing from any act of Libya or NOC. Claim 8 must join claims 1–7 in dismissal.

## IV

## CONCLUSION

For all the foregoing reasons, I lack both subject matter and personal jurisdiction over Libya and NOC and all the claims against them. I am constrained, therefore, to dismiss the action against both defendants under Fed.R.Civ.P. 12(b)(1) and (2).

SO ORDERED.

---

4. The one exception appears in 28 U.S.C.A. § 1605(a)(3) (West 1978 Supp.), and involves expropriation of property physically located in the United States, an exception plainly irrelevant here.