**Josefina Najarro DE SANCHEZ, Plaintiff-Appellant,**

v.

**BANCO CENTRAL DE NICARAGUA, A Foreign Banking Corporation, et al., Defendants-Appellees.**

No. 84–3247.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1985.

DeRussy & Matthews, John G. DeRussy, New Orleans, La., and Armstrong & Mejer, Timothy J. Armstrong, Coral Gables, Fla., for plaintiff-appellant.

Liskow & Lewis, Joe B. Norman, New Orleans, La., Paul S. Reichler and Judith C. Appelbaum, Washington, D.C., for Banco.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Warren M. Schultz, Jr., New Orleans, La., for Citizens & Southern.

Before GOLDBERG, RUBIN and HILL, Circuit Judges.

GOLDBERG, Circuit Judge:

Clausewitz once described war as politics carried on by other means. Here it could be said that litigation is war carried on by other means. The plaintiff's faction having lost on the battlefield, she now seeks to move the conflict to the courtroom, hoping that, in this case at least, the pen is mightier than the sword.

In July 1979, the Nicaraguan government of General Anastasio Somoza fell to the Sandinista revolutionaries. As usually occurs, members of the old regime fled the country to escape the reach of "revolutionary justice." But where defeated aristoc-

racies once emigrated to London or Paris, now they seem to wind up in Miami. One of these emigres—Mrs. Josefina Navarro de Sanchez, the wife of President Somoza's former Minister of Defense—brought the present suit to collect on a check for $150,-000 issued to her by the Nicaraguan Central Bank (Banco Central de Nicaragua) shortly before Somoza's fall. Mrs. Sanchez was unable to cash this check after the new government assumed power and placed a stop-payment order on it.

Initially, the district court denied Banco Central's motion to dismiss, finding that it had jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1605(a)(3), (5) (1982), and that the act of state doctrine did not apply. *De Sanchez v. Banco Central de Nicaragua,* 515 F.Supp. 900, 910–14 & n. 10 (E.D.La.1981). After discovery was completed, however, the district court reversed itself on the act of state issue, and granted Banco Central's motion for summary judgment.

In reviewing a lower court's decision, we must affirm a correct judgment even when it is based on an inappropriate ground or a wrong reason. *Helvering v. Gowran,* 302 U.S. 238, 245, 58 S.Ct. 154, 158, 82 L.Ed.2d 224 (1937); *Sapp v. Renfroe,* 511 F.2d 172, 175 n. 2 (5th Cir.1975). Because we find that Banco Central is immune from suit under the doctrine of sovereign immunity, we affirm the judgment below.

I

On September 7, 1978, Mrs. Josefina Najarro de Sanchez, a Nicaraguan national, purchased a certificate of deposit worth $150,000 from Banco Nacional de Nicaragua, a then privately-owned commercial Nicaraguan bank. The certificate was payable in United States dollars and had a scheduled maturity date of October 6, 1982. It specified that Banco Nacional would redeem the certificate only at or after this date.

In June 1979, as the Nicaraguan government of General Somoza was on the verge of collapse, Mrs. Sanchez left Nicaragua for Miami, Florida. To raise money for her resettlement expenses, Mrs. Sanchez decided to redeem her certificate of deposit three years prior to its maturity date. She therefore contacted her husband, General Herberto Sanchez, who was still in Nicaragua, and requested that he redeem the certificate.

At the time, Nicaragua was suffering from a critical shortage of foreign exchange. In September 1978, the Nicaraguan government had adopted exchange control regulations limiting sales of foreign exchange by Banco Central to ten specific purposes and requiring that sales of foreign exchange for other purposes be authorized by Banco Central's Board of Directors. Decree 332–MEIC, 4 Rec. at 273–74, 278–80. In May 1979, even tighter restrictions on the use of foreign exchange were imposed pursuant to a standby agreement between Nicaragua and the International Monetary Fund. Despite these restrictions, by July 1979 the nation had a net foreign exchange deficit of over $200 million, and the total liquidity available to the country was no more than $3.5 million, barely enough to meet one average day's worth of import requirements.

Because of the shortage of foreign exchange, redeeming Mrs. Sanchez's certificate of deposit was easier said than done. President Somoza himself, two weeks before fleeing the country, took time from his presumably busy schedule to write a personal letter to the President of Banco Nacional recommending that the certificate be redeemed "as a special case" and stating that he would be "grateful ... for a favorable decision."[1] 4 Rec. at 327, 334. When this proved unavailing due to Banco Nacional's shortage of dollars, the President of Banco Nacional contacted Banco Central requesting that Banco Central sell the dollars necessary to redeem the certificate.

---

**1.** Apparently, General Sanchez was a close personal friend and associate of President Somoza. Indeed, when the Somoza government finally fell on July 17, 1979, General Sanchez was among the handful who departed with Somoza on the same plane.

Dr. Roberto Incer, the President of Banco Central and a cousin of General Sanchez, personally authorized the sale of the dollars by telephone from Guatamala, where he was negotiating a line of credit to a National Guard officer from the Guatamalan Central Bank. Pursuant to Dr. Incer's instructions, Banco Central issued a check directly in favor of Mrs. Sanchez for $150,-000, drawn on Banco Central's account with Citizens and Southern International Bank ("C & S Bank") in New Orleans, Louisiana. Although it is unclear whether Banco Nacional ever reimbursed Banco Central for this money, Banco Nacional did cancel Mrs. Sanchez's certificate after the check to Mrs. Sanchez was issued by Banco Central.

By the time the check reached Mrs. Sanchez in Miami, however, the political situation in Nicaragua had deteriorated even further. Although the new government did not formally come to power in Nicaragua until July 19, 1979, persons purporting to represent the Sandinista government contacted C & S Bank on July 11–13, claiming control over Banco Central's account. To protect the Bank, the President of C & S decided on July 13 not to clear further checks issued by Banco Central. Dr. Arturo Cruz, the new President of Banco Central, telephoned C & S on July 17, reiterating that C & S should freeze Banco Central's account. He confirmed this stop-payment order by telex on July 23, the day after being formally appointed to office.

As a result of these events, when Mrs. Sanchez attempted to cash the check first at C & S's Miami office and later at C & S's New Orleans office, the Bank would not honor it. In Miami, Mrs. Sanchez's son, despite being accompanied by Dr. Incer, the outgoing President of Banco Central, was told on July 16 that the check must be deposited at C & S's New Orleans office, where Mrs. Sanchez had her account. In New Orleans, however, the bank informed her on the following day that there were insufficient funds in Banco Central's account to cover the check. When Mrs. Sanchez re-presented the check three days later on July 20, it was returned to her

marked "refer to maker." That day, Mr. Kenneth Moore, President of the C & S Bank in New Orleans, wrote to Mrs. Sanchez:

> In reference to Banco Central de Nicaragua check number 20110 payable to you in the amount of U.S. Dlrs. 150,000.00, the check payment was refused by us on presentation on July 17, 1979. Due to the fact we had no knowledge of which was the legitimate government of the country on that date due to the civil war in the country, we suspended all payments from [Banco Central's] account, our legal right under the terms of the Uniform Commercial Code of the United States. We were subsequently instructed by Mr. Arturo Cruz, President of the Central Bank, to suspend all payments.

After Dr. Cruz's telephone call was confirmed by the July 23 telex, payment was indefinitely stopped on Mrs. Sanchez's check.

Upon assuming power, the new government of Nicaragua immediately began to establish priorities to govern the use of the country's remaining foreign exchange resources. These priorities were enumerated in a regulation adopted by Banco Central on September 6, 1979. Resolution CD–BCN–VIII–B–79, 4 Rec. at 282–90. In addition, Dr. Cruz ordered the staff of Banco Central to conduct an audit of each check on which payment had been stopped. The purpose was to determine which checks were properly issued and consistent with the national priorities for the use of foreign exchange. Based on the audit, Mrs. Sanchez's check was placed in the category, "[s]ales of foreign exchange to the National Guard ... and to those who are associated or friends of the National Guard." Deposition of Arturo Cruz at 30, 4 Rec. at 105. Although the auditors found that the check was correct "from a purely accounting point of view," id. at 42, 4 Rec. at 112, Dr. Cruz determined that the check to Mrs. Sanchez should not be paid since payment would be inconsistent with the national priorities governing the use of foreign ex-

change.[2] He made this recommendation to the Government Junta—a three-member board that exercises the role of chief executive in the Nicaraguan government—and the Junta agreed.

Mrs. Sanchez brought the present suit to collect on the check issued by Banco Central, alleging breach of the duty to honor the check, misrepresentation, conversion, and breach of contract, and claiming $150,000 plus interest and costs. She named both Banco Central and C & S Bank as defendants. However, she did not contest C & S's motion for summary judgment, which was granted by the district court on October 21, 1981, and which has not been appealed.

The district court initially determined that it had jurisdiction over the suit under the FSIA and denied Banco Central's motion to dismiss. Specifically, the court found that two exceptions to the doctrine of sovereign immunity applied: first, the "expropriation exception," under which a state is not immune from claims involving "rights in property taken in violation of international law," 28 U.S.C. § 1605(a)(3); and second, the tortious activity exception, which denies immunity to foreign states sued for tortious conduct that causes damage to property in the United States, *id.* § 1605(a)(5). *De Sanchez v. Banco Central de Nicaragua,* 515 F.Supp. 900, 910–14 (E.D.La.1981). The district court also held, in passing, that the act of state doctrine did not apply. *Id.* at 910 n. 10.[3]

After discovery was completed, Banco Central moved for summary judgment, reiterating its sovereign immunity claim and arguing additionally that the act of state doctrine applied. The district court agreed

with the second of these arguments—namely, that the suit is barred by the act of state doctrine—and therefore found it unnecessary to review its earlier ruling regarding sovereign immunity. After the district court entered its final order of dismissal on March 16, 1984, Mrs. Sanchez filed the present appeal.

## II

Unlike the act of state doctrine, sovereign immunity is not merely a defense on the merits—it is jurisdictional in nature. If sovereign immunity exists, then the court lacks both personal and subject matter jurisdiction to hear the case and must enter an order of dismissal. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 493 n. 20, 103 S.Ct. 1962, 1971 n. 20, 76 L.Ed.2d 81 (1983); *Sheldon ex rel. Olsen v. Government of Mexico,* 729 F.2d 641, 644 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). In contrast, the act of state doctrine merely requires that a court, after exercising jurisdiction, decline to review certain issues—in particular, the validity or propriety of foreign acts of state. *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 421–23, 84 S.Ct. 923, 936–38, 11 L.Ed.2d 804 (1964); *Ricaud v. American Metal Co.,* 246 U.S. 304, 309, 38 S.Ct. 312, 314, 62 L.Ed. 733 (1918); *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1380 (5th Cir.1980). Because sovereign immunity is jurisdictional and the act of state defense is not, we must consider sovereign immunity before reaching the act of state doctrine. Restatement (Revised) of Foreign Relations Law of the United States § 469 reporters' note 11 (Tent.Draft No. 6, 1985).

---

**2.** [O]n examining the complete voucher of th[e] transaction, it was obvious that it was an outright violation of the law [governing the sale of foreign exchange and the redemption of fixed-time deposits prior to maturity]; it was against normal procedures; and it was a clear case of favoritism by Anastasio Somoza. It was also an abuse of authority, and it was very detrimental to the welfare of my country....

Deposition of Arturo Cruz at 44, 4 Rec. at 114.

**3.** Following the Second Circuit's decision in *Verlinden B.V. v. Central Bank of Nigeria,* 647 F.2d 320 (2d Cir.1981), which held that federal subject matter jurisdiction does not exist over suits between two aliens, Banco Central filed a second motion to dismiss. The district court stayed the proceedings pending a decision by the Supreme Court in *Verlinden.* When the Supreme Court reversed the Second Circuit, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), Banco Central withdrew its motion to dismiss and the district court lifted its stay.

The FSIA was enacted in 1976 to bring uniformity to determinations of sovereign immunity. H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6605–06 ("House Report"). It initially grants immunity to foreign states and their instrumentalities, 28 U.S.C. § 1604, and then carves out certain exceptions to this grant of immunity, *id.* §§ 1605–1607. Unless one of these exceptions applies, then the federal courts lack both subject matter, *id.* § 1330(a), and personal jurisdiction, *id.* § 1330(b).[4]

In the present case, Mrs. Sanchez does not contest that the defendant—Banco Central—is an instrumentality of a foreign state within the meaning of 28 U.S.C. § 1603(b)(2), since it is an organ of the Nicaraguan government.[5] *See* House Report, *supra*, at 6614 ("As a general matter, entities which meet the definition of an 'agency or instrumentality of a foreign government' could assume a variety of forms, including ... a central bank...."). Ordinarily, therefore, it would be entitled to sovereign immunity under Section 1604 of the FSIA. Mrs. Sanchez argued to the district court, however, that three exceptions to sovereign immunity apply: (1) the commercial activity exception, § 1605(a)(2); (2) the expropriation in violation of international law exception, § 1605(a)(3); and (3) the tortious activity exception, § 1605(a)(5).[6] The district court disagreed with Mrs. Sanchez regarding the first of

these exceptions, holding that the suit is based on sovereign, not commercial, activity. It agreed, however, that both the expropriation and tortious activity exceptions apply, and therefore concluded that it had jurisdiction over the suit. Because we disagree that either of these exceptions to sovereign immunity applies, we hold that Banco Central is immune from suit under Section 1604 of the FSIA.

### A

The commercial activity exception is the most frequently argued of the sovereign-immunity exceptions.[7] It antedates the FSIA and embodies the "restrictive theory" of sovereign immunity, under which a foreign state is immune only from suits based on their public as opposed to their commercial acts—their *jure imperii* as opposed to their *jure gestionis*. But whereas prior to the FSIA, the Department of State determined whether the commercial activity exception applied, the FSIA vests this power in the courts to shield the inquiry from political considerations. House Report, *supra*, at 6606. Under the Act, sovereign immunity determinations are to be made on "purely legal grounds", *id.*, rather than on an ad hoc, diplomatic basis.

Like the other exceptions to sovereign immunity, the commercial activity exception attempts to accommodate the interest of private parties in bringing suit with the interest of foreign states in immunity from

---

**4.** Under § 1330(b), personal jurisdiction depends not only on the applicability of an exception to sovereign immunity but also on service of process in compliance with 28 U.S.C. § 1608. In addition, the exercise of personal jurisdiction must meet the constitutional requirements of due process. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

**5.** Banco Central was constituted as a governmental agency by Decree No. 525 of August 23, 1960. *See* 1 Rec. at 87, 91–105.

**6.** Despite the fact that Banco Central reiterated its sovereign immunity arguments to this court on appeal, Mrs. Sanchez did not respond by arguing that the exceptions to sovereign immunity apply. Nevertheless, the sovereign immunity issues are clearly before us because (1) they

are jurisdictional, (2) they formed the basis of the district court's interim opinion, and (3) they were fully argued to the district court.

**7.** As codified in the FSIA, the commercial activity exception states that a foreign state is not immune from suit where

the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

suit. Where a foreign state's sovereign acts are the basis of a suit, the United States refrains from exercising jurisdiction out of respect for the defendant's coequal sovereign status. Where a suit arises from a foreign state's commercial acts, however, the state's interest in immunity is much weaker. As the Supreme Court explained in a related context:

> [S]ubjecting foreign governments to the rule of law in their commercial dealings presents a much smaller risk of affronting their sovereignty than would an attempt to pass on the legality of their governmental acts. In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, they exercise only those powers that can also be exercised by private citizens. Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on "national nerves."

*Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 703–04, 96 S.Ct. 1854, 1866, 48 L.Ed.2d 301 (1976) (plurality opinion) (discussing commercial activity exception to act of state doctrine).

■ In ascertaining whether the commercial activity exception applies, three questions are involved. First, we must define with precision the relevant activity. This requires focusing on the acts of the named defendant, not on other acts that may have had a casual connection with the suit. *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1109 (5th Cir.1985). In particular, we must isolate those specific acts of the named defendant that form the basis of the plaintiff's suit. "The focus of the exception to immunity recognized in § 1605(a)(2) is not on whether the defendant generally engages in a commercial enterprise or activity ...; rather, it is on whether the particular conduct giving rise to the claim in question constitutes or is in connection with commercial activity, regardless of the defendant's generally commercial or gov-

ernmental character." *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1379 (5th Cir.1980). Second, we must determine whether the relevant activity is sovereign or commercial—a label which depends on the nature of the activity rather than on its purpose. 28 U.S.C. § 1603(d). Finally, if the activity is commercial in nature, we must determine whether it had the requisite jurisdictional nexus with the United States.[8] Section 1605(a)(2) identifies three such connections: (1) commercial activity carried on in the United States; (2) acts performed in the United States in connection with commercial activity elsewhere; and (3) direct effects in the United States of commercial activity elsewhere.

We recently addressed the first of these questions in *Callejo v. Bancomer*, 764 F.2d 1101. There, we examined the breach of several certificates of deposit by a nationalized Mexican bank pursuant to newly-promulgated exchange control regulations. We noted that although the promulgation of the exchange regulations by Mexico was a sovereign act, it was not an act effectuated by the defendant. Instead, the relevant acts of the defendant consisted merely of selling and later breaching the certificates. Since these were commercial activities with direct effects in the United States, we held that the bank was not entitled to sovereign immunity.

Here, the activity giving rise to the suit was the issuance of the check to Mrs. Sanchez and the specific act complained of was the failure by Banco Central to honor that check. Consistent with *Callejo*, we must examine the nature of that activity and act, not the connected activities of either the Nicaraguan government or Banco Nacional. If Banco Central's actions were commercial, then it is subject to suit regardless of the fact that it may have acted pursuant to a sovereign decision of the Nicaraguan government to preserve Nicaragua's foreign exchange reserves. *Callejo*, 764 F.2d at 1109–10. Conversely, if its actions were sovereign, then the fact that Banco Nacion-

---

**8.** In the present case, we need not reach this third stage of the inquiry since we hold that the activity at issue was sovereign rather than commercial in nature.

al's initial sale of the certificate to Mrs. Sanchez was commercial does not infect Banco Central. *Cf. Carey v. National Oil Corp.*, 453 F.Supp. 1097, 1102 (S.D.N.Y. 1978) (Libya's actions in inducing oil companies to breach contracts were sovereign in nature, since they were deliberate weapons of foreign policy, even though oil companies' actions in forming the contracts were commercial), *aff'd on other grounds*, 592 F.2d 673 (2d Cir.1979). We turn first to Banco Central's issuance of the check to determine whether it was commercial or sovereign in nature.

Although ascertaining the commercial or sovereign nature of a given activity is usually the critical question in a sovereign immunity case, the FSIA provides distressingly little guidance. The only discussion of the issue occurs in 28 U.S.C. § 1603(d), which states:

A "commercial activity" means either a regular course of conduct or a particular transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

As we recently noted in *Callejo*, "While this is helpful so far as it goes, it is somewhat circular, since it defines 'commercial activity' in terms of 'commercial conduct' and 'commercial transaction' but contains no independent definition of 'commercial.'" 764 F.2d at 1108 n. 6.

The legislative history of the FSIA provides more guidance. As examples of commercial activities, the House Report lists "a foreign government's sale of a service or a product, its leasing of property, its borrowing of money, its employment or engagement of laborers, clerical staff or public relations or marketing agents, [and] its in-

vestment in a security of an American corporation." House Report, *supra*, at 6615. More generally, the legislative history suggests that courts should "inquire whether the activity in question is one which private persons ordinarily perform or whether it is peculiarly within the realm of governments." *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary*, 94th Cong., 2d Sess. 53 (1976) (statement of Monroe Leigh, Legal Advisor, U.S. Dep't of State). However, Congress recognized that by not defining "commercial activity" with precision, the courts would have "a great deal of latitude" in interpreting the exception. House Report, *supra*, at 6615.

The principle obstacle in determining whether an activity is commercial or sovereign in nature is that the same activity can often be characterized in a number of different ways. A federal trial, for example, could be characterized in the broadest, generic terms as a form of dispute resolution, or, more specifically, as government-sponsored adjudication. But whereas the broad category of dispute resolution encompasses activities that might be considered commercial, such as paid-for arbitration, the narrower category of adjudication defines an intrinsically public activity, invested with the sovereign authority of the state. Here, a similar quandary arises. Banco Central's issuance of the check could be characterized either as a sale of foreign currency or as the regulation and supervision of Nicaragua's foreign exchange reserves. The former is a commercial activity: Private banks often sell foreign currency to one another, particularly if they have a correspondent-bank relation.[9] The regulation and supervision of a nation's foreign ex-

---

**9.** The commercial activity issue would be much easier if the sale of dollars had not been an ordinary banking function at the time—that is, if Banco Central had had exclusive authority over all sales of foreign exchange. In that event, the sale by Banco Central would have been uniquely governmental. Here, however, this was not true. If other commercial banks had had dollars on hand, they could have sold them to Banco Nacional. *See* Decree 332–MEIC art. 4, 4 Rec. at 279. Banco Nacional was forced to go to Banco Central to purchase the necessary dollars not due to any legal requirement but only because, as a practical matter, no other bank had any dollar reserves.

change reserves, however, is a sovereign activity. It is one aspect of a government's sovereign function of regulating the monetary system.

■ Despite these difficulties, we have little trouble characterizing Banco Central's issuance of the check as sovereign. Under Nicaragua's foreign exchange regulations, Banco Central's actions in selling foreign exchange reserves were not the same as those of a private bank. By law, Banco Central had overall responsibility for the control and management of Nicaragua's monetary reserves. Decree 525 of August 23, 1960, art. 4(h), 1 Rec. at 88. It was permitted to sell foreign exchange only for certain limited purposes. Indeed, by June of 1979, Nicaragua's dollar holdings had become so depleted that the President of Banco Central ordered his foreign exchange manager to clear every sale of dollars personally with him. Deposition of Dr. Roberto Incer at 17. Unlike Banco Nacional, which sold the certificate of deposit to Mrs. Sanchez in order to earn profits, Banco Central did not enter the marketplace as a commercial actor, nor did it earn any fee by issuing the check to Mrs. Sanchez. *Id.* at 13. Instead, Banco Central became involved with Mrs. Sanchez only in its official role of regulating the sale of foreign exchange. Its only authorized purpose in issuing the check was to maintain stable exchange rates and to allocate scarce foreign exchange reserves among competing uses. Consequently, in the current context, characterizing Banco Central's action as a sale of dollars is not merely incomplete—it is incorrect. *Cf. National City Bank v. Republic of China,* 348 U.S. 356, 364, 75 S.Ct. 423, 429, 99 L.Ed. 389 (1955) (sale of Chinese treasury notes a sovereign act); *id.* at 368, 75 S.Ct. at 431 (Reed, J. dissenting) (same).

We recognize that in differentiating sales of dollars by Banco Central from sales by private banks, we rely on the different purposes motivating the sales. This might seem to contravene the requirement that, in determining whether an activity is commercial or sovereign, we examine its "nature" rather than its "purpose." 28 U.S.C. § 1603(d). We do not interpret this provision, however, to bar us totally from considering the purposes of different types of activities. Indeed, we do not believe that an absolute separation is always possible between the ontology and the teleology of an act. Often, the essence of an act is defined by its purpose—gift-giving, for example. Unless we can inquire into the purposes of such acts, we cannot determine their nature. Indeed, commercial acts themselves are defined largely by reference to their purpose. What makes these acts commercial is not some ethereal essence inhering in the conduct itself; instead, as Congress recognized, acts are commercial because they are generally engaged in for profit. House Report, *supra,* at 6615.

Congress's intent in instructing us to focus on the nature of an activity rather than on its purpose was to preclude foreign governments from always being able to claim sovereign immunity. Whenever a government enters the marketplace to buy or sell goods, its purpose ultimately is not to earn profits; in some sense, its motivation is the public good. Consequently, if the purpose of an activity defined in full whether the activity was sovereign or commercial, all governmental activities would be sovereign.

Here, Banco Central's purpose in selling dollars—namely, to regulate Nicaragua's foreign exchange reserves—was not ancillary to its conduct; instead, it defined the conduct's nature. Banco Central was not merely engaging in the same activity as private banks with a different purpose; in a basic sense, it was engaging in a different activity. It was performing one of its intrinsically governmental functions as the Nicaraguan Central Bank.[10] *See Braka v.*

---

**10.** In this respect, Banco Central's actions differ from those of a government agency that purchases cement or bullets, both of which are considered to be commercial acts. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 310 & n. 27 (2d Cir.1981), *cert.*

*Bancomer, S.A.,* 589 F.Supp. 1465, 1469 (S.D.N.Y.1984), *aff'd,* 762 F.2d 222 (2d Cir. 1985). As such, it was wearing its sovereign rather than its commercial hat. If we were to hold that a central bank is subject to suit for its actions in regulating its foreign exchange reserves, we would interfere with this basic governmental function and would thereby touch sharply on "national nerves," contrary to the policies underlying the FSIA.

▮ Previously, we have held that sovereign immunity did not apply to certain breaches of commercial contracts that we found to be commercial acts. *Callejo,* 764 F.2d 1101 (defendant breached certificates of deposit that it had sold to plaintiffs while it was still a private bank); *Arango,* 621 F.2d 1371 (Dominican national airline breached tour package); *see also Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300 (2d Cir. 1981) (Nigerian government breached cement-purchase contracts), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).[11] Conversely, we hold here that the sovereign nature of Banco Central's issuance of the check imbued its later breach with sovereignty. Where a government enters into a contract in its sovereign capacity, then the breach of that contract partakes of the contract's initial sovereignty.

*See MOL, Inc. v. Peoples Republic of Bangladesh,* 736 F.2d 1326, 1329 (9th Cir.) (breach-of-contract suit barred by sovereign immunity since contract for sale of rhesus monkeys concerned "Bangladesh's right to regulate its natural resources, ... a uniquely sovereign function"), *cert. denied,* —— U.S. ——, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984). Since Nicaragua never entered the marketplace as a commercial actor in regard to Mrs. Sanchez's check, it is not subject to suit.

This conclusion is consistent with the policies underlying the commercial activity exception. As we have noted, the commercial activity exception rests on the theory that where a state enters into a commercial contract with a private party, the private party's interest in bringing suit is particularly great and the state's interest in immunity correspondingly small. Subjecting the state to suit does not affront its sovereign status and hence is unlikely to cause friction. Where a state enters into a contract that is sovereign in nature, however, the balancing of interests is different. The private party could not have entered into a similar contract with other private parties and has no legitimate expectation of being able to bring suit on the contract. Correspondingly, the state's interest in immunity is great since the contract involves its intrinsically sovereign activities. Subjecting

---

*denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); House Report, *supra,* at 6615. In purchasing cement or bullets, a government agency does not perform an intrinsically governmental function; instead, it performs acts that are ancillary to the independently identifiable governmental functions of building harbors and fighting wars.

**11.** In *Callejo* and *Arango,* however, we did not decide as a general matter whether the breach of a commercial contract is necessarily a commercial act, or whether it could in some cases be imbued with sovereignty. In *Callejo,* our decision turned on the fact that the named defendant had merely complied with, rather than promulgated, the governmental exchange control regulations. We left open the question of whether, if the defendant had been the central bank, with overall responsibility for the control of foreign exchange, it would have been immune. *See Callejo,* 764 F.2d at 1110 ("[Bancomer] was not the central bank and it had no

special role in effectuating the monetary controls beyond complying with the decrees.") (quoting *Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1470 (S.D.N.Y.1984), *aff'd,* 762 F.2d 222 (2d Cir.1985)). Similarly, in *Arango,* the government had not decided as a sovereign matter to breach the plaintiff's tour package; instead, the breach had merely been a proximate result of the government's decision to deny the plaintiffs entry. Therefore, the question of whether the government would have been subject to suit if it had specifically abrogated the tour contract was not resolved. *Cf. Carey v. National Oil Corp.,* 453 F.Supp. 1097, 1102 (S.D. N.Y.1978) (Libya's actions in inducing oil companies to breach commercial contracts with other oil companies were sovereign in nature since they were deliberate weapons of foreign policy), *aff'd on other grounds,* 592 F.2d 673 (2d Cir. 1979). *But cf. Texas Trading,* 647 F.2d at 310 (holding that commercial activity exception applied even where government made sovereign decision to breach cement-purchase contracts).

the state to suit under these circumstances is likely to touch on "national nerves." Consequently, the FSIA mandates that the breach of such contracts, like the contracts themselves, be considered sovereign in nature.

For these reasons, we agree with the district court that the commercial activity exception does not apply.

**B**

Section 1605(a)(3) of the FSIA provides that a foreign state shall not be immune from suit in any case "in which rights in property taken in violation of international law are in issue."[12] The section parallels the so-called "Hickenlooper Exception" to the act of state doctrine, 22 U.S.C. § 2370(e)(2) (1982), under which courts may not invoke the act of state doctrine in cases where a claim to property is asserted based upon "a confiscation or other taking ... by an act of [a foreign] state in violation of the principles of international law." Like the Hickenlooper Exception, Section 1605(a)(3) "was intended to subject to United States jurisdiction any foreign agency or instrumentality that has nationalized or expropriated property without compensation, or that is using expropriated property taken by another branch of the state." *Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne de Navigation*, 730 F.2d 195, 204 (5th Cir.1984).

Precisely what types of "rights in property" fall within the compass of Section 1605(a)(3) has been the subject of some dispute. Several courts have interpreted the Hickenlooper Exception not to apply to takings of intangible interests such as the contractual right to receive payment. *See Menendez v. Saks & Co.*, 485 F.2d 1355, 1372 (2d Cir.1973) (an alleged "repudiation of a contractual obligation does not amount to a 'confiscation or other taking' "), *rev'd in part on other grounds sub nom. Alfred*

*Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Braka v. Bancomer, S.A.*, 589 F.Supp. 1465, 1472–73 (S.D.N.Y. 1984), *aff'd*, 762 F.2d 222 (2d Cir.1985); *French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 58–62, 295 N.Y.S.2d 433, 445–49, 242 N.E.2d 704, 716–20 (1968). This principle has been extended to the FSIA on the ground that the Hickenlooper Exception and Section 1605(a)(3) are congruent. *Canadian Overseas Ores Ltd. v. Compania de Acero del Pacifico*, 528 F.Supp. 1337, 1346 (S.D.N.Y.1982), *aff'd*, 727 F.2d 274 (2d Cir.1984).

We need not decide here, however, whether Mrs. Sanchez's contractual right to receive payment on Banco Central's check is a "right in property" within the meaning of Section 1605(a)(3). Instead, there is a more basic reason why Nicaragua's actions are not subject to review: the breach by Nicaragua of Mrs. Sanchez's contractual rights did not violate international law, since it affected only a Nicaraguan national, Mrs. Sanchez. With a few limited exceptions, international law delineates minimum standards for the protection only of aliens; it does not purport to interfere with the relations between a nation and its own citizens. Thus, even if Banco Central's actions might have violated international law had they been taken with respect to an alien's property, the fact that they were taken with respect to the intangible property rights of a Nicaraguan national means that they were outside the ambit of international law.

In applying Section 1605(a)(3), our inquiry is narrowly circumscribed. The question is not whether a foreign state's actions are consistent with United States law or United States conceptions of public policy. Nor are we concerned with whether, on the merits, we should recognize or assist the taking of property by the foreign state. Instead, the question is solely

---

**12.** In addition, under § 1605(a)(3), the property in issue must have a jurisdictional nexus with the United States; in particular, it must either (a) be present in the United States in connection with a commercial activity carried on in the United States by the foreign state, or (b) be owned or operated by an agency or instrumentality of the foreign state that is engaged in a commercial activity in the United States.

whether any generally accepted norm of *international* law prohibits the defendant's actions. If not, then unless another exception to sovereign immunity applies, the foreign state is immune from suit and we lack jurisdiction to inquire into the validity of its conduct.

■ International law, as its name suggests, deals with relations between sovereign states, not between states and individuals.[13] *Dreyfus v. Von Finck,* 534 F.2d 24, 30–31 (2d Cir.), *cert. denied,* 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976); *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir. 1975); Von Redlich, *The Law of Nations* 5 (2d ed. 1937). Nations not individuals have been its traditional subjects. J. Starke, *An Introduction to International Law* 53 (1963); R. Swift, *International Law: Current and Classic* 45 (1969). Injuries to

individuals have been cognizable only where they implicate two or more different nations: if one state injures the national of another state, then this can give rise to a violation of international law since the individual's injury is viewed as an injury to his state. As long as a nation injures only its own nationals, however, then no other state's interest is involved; the injury is a purely domestic affair, to be resolved within the confines of the nation itself.[14] *See Dreyfus,* 534 F.2d at 31 ("[V]iolations of international law do not occur when the aggrieved parties are nationals of the acting state.");[15] R. Swift, *supra,* at 324 ("Traditionally, states have been free under international law to treat their nationals as they wished.").

Recently, this traditional dichotomy between injuries to states and to individu-

---

**13.** In ascertaining the content of international law, the Supreme Court directs us to consult "the works of jurists, writing professedly on public law," on "the general usage and practice of nations," and on "judicial decisions recognizing and enforcing that law." *United States v. Smith,* 18 U.S. (5 Wheat.) 153, 160–61, 5 L.Ed. 57 (1820). A settled rule of international law is one which has "the general assent of civilized nations." *The Paquete Habana,* 175 U.S. 677, 694, 20 S.Ct. 290, 297, 44 L.Ed. 320 (1900).

> [W]here there is no treaty and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.

*Id.* at 700, 20 S.Ct. at 299.

**14.** Potentially, an injury by a state to its own nationals might implicate international law if the injury occurred within another state's territory. In that event, the state where the injury occurred might have an interest if the injury affected its territorial sovereignty. International law would become involved not because of the status of the injured party but because of the location of the injury.

In the present case, Mrs. Sanchez claims that her injury occurred in the United States, since that is where Banco Central's check was made payable. We need not decide here whether Banco Central's contractual obligations were

"located" in the United States. Even if they were, the breach of these obligations was not of such a nature as to affront the territorial sovereignty of the United States. The situation might be different if Nicaragua had attempted to expropriate a piece of real property owned by Mrs. Sanchez in the United States. Then, Nicaragua's actions could be seen as literally challenging the authority of the United States over its own territory. We decide here only that takings of *intangible* property rights—including breaches of contract—do not violate international law where the injured party is a national of the acting state, regardless of the property's location.

**15.** In *Filartiga v. Pena-Irala,* 630 F.2d 876 (2d Cir.1980), the court criticized this statement in *Dreyfus* as being "clearly out of tune with the current usage and practice of international law." *Id.* at 884. The *Filartiga* court found instead that "international law confers fundamental rights upon all people vis-a-vis their own governments" and that "the right to be free from torture is now among them." *Id.* at 885. However, when read together with the later Second Circuit opinion in *Verlinden B.V. v. Central Bank of Nigeria,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983), it is clear that this criticism was made only in relation to the international law of human rights, and was not intended to call into question the principle enunciated in *Dreyfus* as it applies to expropriations of property. In *Verlinden,* Judge Kaufman, the author of *Filartiga,* cited *Dreyfus* with approval in holding that "commercial violations, such as those here alleged, do not constitute breaches of international law." 647 F.2d at 325 n. 16.

als—and between injuries to home-grown and to alien individuals—has begun to erode. The international human rights movement is premised on the belief that international law sets a minimum standard not only for the treatment of aliens but also for the treatment of human beings generally. Nevertheless, the standards of human rights that have been generally accepted—and hence incorporated into the law of nations—are still limited. They encompass only such basic rights as the right not to be murdered, tortured, or otherwise subjected to cruel, inhuman or degrading punishment; the right not to be a slave; and the right not to be arbitrarily detained. *See Filartiga v. Pena-Irala,* 630 F.2d 876, 884–85 (2d Cir.1980) (official torture violates international law even if practiced on state's own citizens); Restatement (Revised) of Foreign Relations Law of the United States § 702 (Tent.Draft No. 6, 1985). At present, the taking by a state of its national's property does not contravene the international law of minimum human rights.[16] This has been held to be true in much more egregious situations than the present, including cases where the plaintiff had had his property taken pursuant to Nazi racial decrees. *Dreyfus,* 534 F.2d at 30–31. It is certainly true here. As the court noted in *Jafari v. Islamic Republic of Iran,* 539 F.Supp. 209 (N.D.Ill.1982):

> It may be foreign to our way of life and thought, but the fact is that governmental expropriation is not so universally abhorred that its prohibition commands the "general assent of civilized nations" ...—a prerequisite to incorporation in the "law of nations".... We cannot elevate our American-centered view of governmental taking of property without compensation into a rule that binds all "civilized nations."

*Id.* at 215.[17]

The doctrine that international law does not generally govern disputes between a state and its own nationals rests on fundamental principles. At base, it is what makes individuals subjects of one state

---

**16.** *Verlinden B.V. v. Central Bank of Nigeria,* 647 F.2d 320, 325 n. 16 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983); *Dreyfus,* 534 F.2d at 30–31; *Vencap,* 519 F.2d at 1015 ("We cannot subscribe to plaintiffs' view that the Eighth Commandment 'Thou shalt not steal' is part of the law of nations."); *Jafari v. Islamic Republic of Iran,* 539 F.Supp. 209, 215 (N.D.Ill.1982); *cf. United States v. Belmont,* 301 U.S. 324, 332, 57 S.Ct. 758, 761, 81 L.Ed. 1134 (1937) ("What another country has done in the way of taking over property of its nationals ... is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled."); *F. Palicio y Compania, S.A. v. Brush,* 256 F.Supp. 481, 487 (S.D.N.Y.1966) ("[C]onfiscations by a state of the property of its own nationals, no matter how flagrant and regardless of whether compensation has been provided, do not constitute violations of international law."), *aff'd mem.,* 375 F.2d 1011 (2d Cir.), *cert. denied,* 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967); *Salimoff & Co. v. Standard Oil Co.,* 262 N.Y. 220, 227, 186 N.E. 679, 682 (1933) ("According to the law of nations, [the Soviet Union] did no legal wrong when it confiscated the oil of its own nationals and sold it in Russia to the defendants."); Restatement (Revised), *supra,* § 702 comment a.

**17.** Our statement in *Maltina Corp. v. Cawy Bottling Co.,* 462 F.2d 1021 (5th Cir.), *cert. denied,* 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972), that "courts will not give 'extra-territorial effect' to a confiscatory decree of a foreign state, *even where directed against its own nationals," id.* at 1025 (emphasis added), is inapposite here. In *Maltina,* we were considering the territorial limitation to the act of state doctrine, not the FSIA or the Hickenlooper Exception. Under this limitation, foreign acts of state that affect property located in the United States are only recognized if consistent with American public policy. Since confiscations of property without compensation violate American public policy, we held in *Maltina* that the act of state doctrine does not apply to takings that purport to apply to property within the United States. *Id.*

The FSIA does not contain such a territorial limitation. Indeed, foreign states are often immune from suits based on acts occurring in the United States—for example, if the act is a discretionary tort. Section 1605(a)(3) is analogous not to the territorial limitation to the act of state doctrine, but rather to the Hickenlooper Exception. Under § 1605(a)(3), we are concerned with the validity of an act under international law, not with its consistency with United States public policy. While takings of property without compensation violate American public policy regardless of the nationality of the property owner, they violate international law only where the property owner is an alien.

rather than of the international community generally. If we could inquire into the legitimacy under *international* law of Nicaragua's actions here, then virtually no internal measure would be immune from our scrutiny. Concomitantly, actions of the United States affecting the property of American citizens would become subject to international norms and hence reviewable by the courts of other nations. In the field of international law, where no single sovereign reigns supreme, the Golden Rule takes on added poignancy. Just as we would resent foreign courts from telling us how we can and cannot rule ourselves, we should be reluctant to tell other nations how to govern themselves. Only where a state has engaged in conduct against its citizens that outrages basic standards of human rights or that calls into question the territorial sovereignty of the United States is it appropriate for us to interfere. Since this is not such a case, we decline to apply international law to Nicaragua's conduct.

### C

The final exception to sovereign immunity invoked by Mrs. Sanchez is the tortious activity exception. 28 U.S.C. § 1605(a)(5).[18] Under this exception, a foreign state is not immune from suit where money damages are sought for losses of property caused by the tortious act or omission of the foreign state. Although the exception was directed primarily at traffic accidents, *see* House Report, *supra*, at 6619, it is cast in general terms that apply to all tort actions for money damages.

■ We need not pause long over this argument. Mrs. Sanchez brought two claims in tort against Banco Central, one

for misrepresentation and one for conversion of property. The first of these is explicitly exempted from the tortious activity exception. 28 U.S.C. § 1605(a)(5)(B) ("this paragraph shall not apply to . . . . . any claim arising out of . . . misrepresentation"). The second, although nominally within the ambit of the exception, is not the type of tort claim that the exception was intended to cover. Mrs. Sanchez's claim, although sounding in tort, is essentially a claim for an unjust taking of property. As noted, Congress has provided an exception in Section 1605(a)(3) for takings of property that violate international law. We do not believe that Congress intended plaintiffs to be able to rephrase their takings claims in terms of conversion and thereby bring the claims even where the takings are permitted by international law.

This interpretation of Section 1605(a)(5) is buttressed by the interpretations given the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2674, 2680 (1982), upon which Section 1605(a)(5) was based. House Report, *supra*, at 6619–20. In *Myers v. United States*, 323 F.2d 580 (9th Cir.1963), the Ninth Circuit rejected the plaintiffs' attempt to characterize their claims as trespass and waste, where the government had damaged their land while building a road. As the court noted,

> The repeated characterization by the appellants of the taking by the United States as one of trespass and the commission of waste . . . does not convert the claims to cases sounding in tort and thereby confer jurisdiction on the District Court under the Federal Tort Claims Act. The Fifth Amendment to the Constitution prohibits the taking of private

18. Section 1605(a)(5) provides:
   (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
   . . . .
   (5) not otherwise encompassed . . . [by the commercial activity exception], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of

any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to—
(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or
(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

property for public use without just compensation. To us the claims of appellants against the United States are founded upon the Constitution, and the acts of the United States complained of are in the nature of inverse condemnation.

*Id.* at 583; *see also Roman v. Velarde,* 428 F.2d 129, 132 & n. 5 (1st Cir.1970) ("[T]he FTCA does not provide a supplementary forum for plaintiffs demanding compensation for land permanently taken."); *cf. Blanchard v. St. Paul Fire & Marine Insurance Co.,* 341 F.2d 351, 358 (5th Cir.) (claims founded upon alleged failure to perform contractual obligations are not "tort" claims regardless of how plaintiff charac-

terizes them), *cert. denied,* 382 U.S. 829, 86 S.Ct. 66, 15 L.Ed.2d 73 (1965).

Because Mrs. Sanchez's claim for conversion is in essence a property rather than a tort claim, we hold that Section 1605(a)(5) does not apply.[19]

### III

Because we find that no exception to sovereign immunity applies, we conclude that Banco Central is immune from suit and that the district court lacked jurisdiction over Mrs. Sanchez's claim. We therefore affirm the dismissal by the district court.

AFFIRMED.

**19.** Having disposed of the tortious activity exception on this basis, my colleagues feel it unnecessary to discuss whether Nicaragua's actions fall within the compass of the discretionary function exemption, 28 U.S.C. § 1605(a)(5)(A). However, my well-known, although not universally accepted, penchant for verbosity compels me to add that, in my view, the discretionary function exemption provides an additional ground for holding that the tortious activity exception does not apply. This exemption was modeled on the discretionary function exemption to the FTCA, 28 U.S.C. § 2680(a), House Report, *supra,* at 6620, and cases construing the FTCA are therefore applicable here, *Sheldon ex rel. Olsen v. Government of Mexico,* 729 F.2d 641, 646–47 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 295, 83 L.Ed.2d 230 (1984). Under the exemptions, governments are liable only for their "operational" decisions, not their "planning" decisions. *Payton v. United States,* 679 F.2d 475, 479–80 (5th Cir.1982) (en banc). "Where there is room for policy judgment and decision there is discretion." *Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953).

Here, the decision to stop payment on the check was, in my view, clearly discretionary. Under Nicaraguan law, Banco Central had general supervision of Nicaragua's currency and foreign exchange. Decree 525 of August 23, 1960, 1 Rec. at 87–88. In particular, it had authority to "control and manage the international monetary reserves of the country." *Id.* at art. 4(g). Pursuant to this authority, the exchange control regulations of September 9, 1978 and September 6, 1979, were promulgated, the latter by Banco Central itself. Given this broad authority, I believe that Banco Central had the discretionary power, under Nicaraguan law, to preserve Nicaragua's foreign exchange reserves by stopping payment on checks drawn on its United States dollar accounts.

The purpose of the discretionary function exemption is "to allow government executives to make policy decisions in an atmosphere free of concern over possible litigation." *Sheldon,* 729 F.2d at 647. Here, Nicaragua's decision to stop payment on Mrs. Sanchez's check was a basic policy decision. It was made at the highest levels of government, pursuant to the critical governmental function of preserving foreign exchange resources. Mrs. Sanchez does not allege merely that Banco Central committed wrongdoing in implementing or administering a governmental policy; she does not contend that the check was not honored due to an operational decision by the bank auditors. Instead, she challenges the government's high-level policy decisions first to stop payment on all checks issued by the former government and later not to honor checks made payable to associates of National Guardsmen. I believe that these policies were clearly discretionary in character, and that this provides an additional basis for not applying Section 1605(a)(5). *See Asociacion de Reclamantes v. United Mexican States,* 561 F.Supp. 1190, 1198 (D.D.C.1983) (where Mexico refused to compensate plaintiffs for land grant claims, discretionary exemption applied since decision not to compensate made at highest levels of government and "raise[d] substantial and serious questions of fiscal policy, and the allocation of limited resources"), *aff'd on other grounds,* 735 F.2d 1517 (D.C.Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985); *Matter of Sedco, Inc.,* 543 F.Supp. 561, 567 (S.D.Tex.1982) ("To deny immunity to a foreign state for the implementation of its domestic economic policies would be to completely abrogate the doctrine of foreign sovereign immunity by allowing an exception to swallow the grant of immunity preserved by § 1604."); *cf. Frolova v. USSR,* 558 F.Supp. 358, 363 (N.D.Ill.1983) (denial of immigration a public act), *aff'd,* 761 F.2d 370 (7th Cir.1985).

ALVIN B. RUBIN, Circuit Judge, concurring.

If Mrs. Sanchez's contractual right to receive payment of the Banco Central check is property, and if that property right has sufficient nexus with the United States to be considered situated in the United States, then, I submit, the FSIA would not exempt the "taking" of that right from attack in the United States because the right is intangible and its owner is a Nicaraguan national. If Mrs. Sanchez, who is now a resident of the United States, owned stock in a publicly held United States corporation, the Nicaraguan government's taking of that property would not be immunized from attack in United States courts by § 1605(a)(3).

I cannot agree that "as long as a nation injures only its own nationals...." [as the majority states], then no other state's interest is involved. The interests of the United States are involved if a nation takes property legally situated within its borders from a person resident in the United States, whether the property is tangible (as the majority agrees) or intangible. International law forbids, and certainly does not condone, a nation's taking of private property situated in another nation simply because the owner of the property is a citizen of the rapacious nation. I see no statutory justification for the distinction drawn by the majority between the taking of tangible property that the majority says would be cognizable in our courts, and the taking of an intangible so long as that intangible has a situs in the United States. If, however, there was no taking, then it is immaterial whether the right pertained to a tangible or an intangible.

Because, in my opinion, Nicaragua's stop-payment order was simply a breach of contract and, as such, did not constitute a "taking of property," and because Mrs. Sanchez's claim is, however circuitously put by her counsel, essentially one for breach of contract, not for a tort, I concur in the result.